257 P.2d 915

STATE v. COMPTON.

No. 5486.

Supreme Court of New Mexico.

May 19, 1953.

Garland & Sanders, Las Cruces, Benjamin M. Sherman, Deming, H. A. Kiker, Santa Fe, for appellant.

Joe L. Martinez, Atty. Gen., Frank B. Zinn, Asst. Atty. Gen., J. R. Wrinkle, Sp. Pros., Silver City, for appellee. ·

PER CURIAM.

The defendant has filed a motion for rehearing and upon consideration thereof, the opinion heretofore filed has been withdrawn and the one to follow is substituted therefor.

Opinion.

SADLER, Chief Justice.

The defendant asks us to reverse two convictions suffered by him in the district court of Grant County for the larceny of cattle, in the one case a heifer calf being the subject of the larceny and in the other a bull calf, both belonging to Victoria Land and Cattle Company. The two cases were based on different informations but were consolidated for purposes of trial, following which separate sentences to run concurrently were imposed calling for confinement in the state penitentiary, after a verdict of guilty in each case. The defendant prosecutes this appeal in an effort to secure a new trial of each charge filed against him.

The defendant was foreman during 1950 of the Todhunter ranch in Grant County, owned by Mrs. Margaret Todhunter, consisting of some 75 sections of land bordering at the Southwest corner for a distance of two miles the ranch of Victoria Land and Cattle Company, sometimes called the Diamond A ranch. He had previously worked for Mrs. Todhunter for four months in 1947, six months in 1948 and from April 13, 1949, to the time of his arrest on September 28, 1950. He lived alone on the ranch during the period between July 22, 1950 and September 1, 1950, when two young boys, one 11 and the other 12 years of age, sons of neighboring ranchers, spent a considerable portion of the time with him on the ranch, apparently assisting in the performance of such odd jobs as they were capable of doing. Mrs. Todhunter, owner of the ranch, was absent on a vacation in Hawaii between July 22, 1950, and September 1, 1950. She returned to New Mexico and her home on the ranch at date last mentioned.

The day after defendant's arrest the brand inspector of Cattle Sanitary Board for this territory with eleven others as-

sisting conducted a roundup of the cattle on the Todhunter ranch. It produced 326 Todhunter cows and 322 calves belonging to them; also 101 calves of which 41 steer calves bore the Todhunter brand, 3 unmarked heifers and 2 unmarked bull calves and the remainder having a cropped left ear, a marking employed somewhat frequently by ranchers, including the defendant. There were no criminal charges of any kind filed or pressed as to the 101 calves rounded up by the brand inspector and his helpers, except the two that are the subject of this prosecution and 97 of these calves were subsequently sold by Cattle Sanitary Board as unclaimed animals.

The Todhunter ranch is cut up into four or five pastures rather than constituting one large pasture. In the northwest corner of the ranch there was a location known as the "Big Mill" section due, no doubt, to the fact that it was the site of a large windmill and watering tank for use by the cattle grazing in that part of the ranch. Visiting this section of the ranch during the roundup the brand inspector and his men found a small pasture of about 80 acres fenced off within a larger one of about 4 sections. It was called a "weaning trap" and was used for confining calves separate and apart from their mothers during the weaning period.

It is the practice to have a wire corral inside the weaning trap in which calves being weaned are placed for two or three days or until they get sore noses from "rubbing" or "butting" them against the wire fence around the corral. In other words, as testified by the brand inspector "they get them fence-broke * * * and then put them out in another pasture." The roundup party found a cow and four calves in this weaning trap, one of which belonged to and sucked her. The cow was what is known in ranching parlance as a "fighter" cow. One of the four calves in the weaning pen was hers. Two others of the four sucked other cows found on the Todhunter ranch. The last of the four, a heifer with a bobbed tail did not suck any cow on the Todhunter ranch. The roundup also produced an unmarked, unbranded bull calf which none of the Todhunter cows would claim.

The brand inspector, J. A. Miller, testified further concerning the weaning trap and the cow and calves found there, as follows:

"Q. As I understand it, Mr. Miller, from your testimony, that this eighty acre pasture is inside the four section pasture that is cut off from the big pasture. A. Yes.

"Q. Does the four section pasture here at any point or any place border on the Victoria Land and Cattle Company? A. No, sir.

"Q. Does the eighty acre pasture border on the Victoria Land and Cattle Company? A. It does not.

\*      \*      \*      \*      \*      \*

"Q. Now, just go ahead and tell the jury what you did when you rode up and went into the weaning trap? A. We took the calves and put them in the corral.

"Q. Did you have any trouble with the calves or anything of that sort? A. Not any trouble with the calf. With the cow we had trouble.

"Q. How many cows in the weaning trap? A. One cow and four calves.

"Q. Describe the cow. A. Well, the cow, she was on the fights. She began fighting the instant we rode up to her. We had considerable trouble getting her to the corral.

"Q. What do you mean considerable trouble? What did you have to do? A. We give her a lot of room and finally went out and got some other cattle, young cows, brought them into the corral with her and she followed them into the corral.

"Q. In other words, you had to get some other cows to go in there and follow her out? A. That is right."

As stated above, one of the four calves in the weaning trap belonged to the "fighter" cow. The roundup party "bobbed" the tails of these other three calves, after getting them in the corral, indeed, one of them already had a "bobbed" tail but as said by a witness they "bobbed off the tail some more." These three were all heifer calves and after bobbing their tails they were turned out with the other cattle which had been rounded up and were being held outside the weaning trap. When they began to mingle with the other cattle one of the three calves mentioned (not the one with its tail already bobbed), began sucking a cow bearing the Diamond A or Victoria Land and Cattle Company brand. Next day they found still another of the three calves mentioned, other than the one with its tail already bobbed, had found its mother in the cattle rounded up and was with her, a cow bearing the brand of a neighboring rancher named Hightower.

Soon after the roundup was completed, Victoria Land and Cattle Company, owner of a ranch adjoining the Todhunter ranch, discovered some wet cows belonging to it with enlarged bags and took them to Deming. A Victoria cow mothered the bull calf rounded up on the Todhunter ranch and an employee of the Victoria ranch, having recognized the heifer calf, brought in a Victoria cow which claimed it. The Todhunter ranch is accessible from the Victoria ranch by a road along a gas line which has cattle guards and gates. Em-

ployees of the gas company occasionally used this road and had keys for the gates.

In view of the fact that the court is of divided opinion as to how this appeal should be determined, a majority entertaining the view that it should be affirmed and a minority that it should be reversed and a new trial awarded, the errors assigned will be treated in a somewhat different order than otherwise would be the case. This is done so as to enable us to treat first in our opinion the controversial issue we decide, then follow this by resolving other errors referred to but not decided in an opinion proposed by Mr. Justice McGhee due to the fact that his opinion ordered a reversal and the errors were such as not likely to occur on a new trial. They are three in number and when they have been resolved by us there will next follow and in his language the portion of the opinion submitted by Mr. Justice McGhee on which we were and still are in agreement. We thus give him credit for the portion of this opinion which he wrote (1) relative to drawing emergency panel for jurors and (2) refusal to defendant of five peremptory challenges as to each of two charges being tried together. Our treatment of the motion for rehearing will close the opinion.

Thus it is, as already indicated, that we first take up for decision the error assigned over which we disagree. It relates to error claimed to inhere in certain instructions given and refused on submitting the case to the jury. Actually, the claimed vice in the given instruction is to be found in the use of the phrase "possession or control" in instruction No. 7 and in the refusal of defendant's specially requested instructions Nos. 2 and 3. In order, therefore, to understand the nature of this objection we must set out the two instructions given which deal with the effect of "possession" of recently stolen property in larceny cases. They are as follows:

"*No. 6* If you find, from the evidence, that the calf was in the possession and control of the defendant at the time, as alleged in the information, this fact standing alone is not sufficient to convict the defendant. I instruct you that the unexplained possession alone by one of livestock belonging to another does not raise the presumption that a larceny has been committed and that the possessor is a thief; it is merely one guilty circumstance which, taken in connection with other testimony, is to determine the question of guilt.

"You must in addition, further find the other elements of the crime heretofore included in other instructions.

"*No. 7* You are further instructed that you must determine from the evidence whether the calf was in the *pos-*

*session or control* of the defendant at the time, as alleged in the information. If you find that said calf was never in the possession or control of the defendant, then there can be no conviction and your verdict must necessarily be for the defendant." (Emphasis ours).

The requested and refused instructions which deal with the effect of possession in larceny cases are defendant's specially requested instructions Nos. 2 and 3. They read as follows:

"*Defendant's Requested Instruction No. 2.*

"You are further instructed that you must determine from the evidence whether the calf was in the possession of the defendant at the time, as alleged in the information. If you find that said calf was never in the possession of the defendant, then there can be no conviction and your verdict must necessarily be for the defendant.

"*Defendant's Requested Instruction No. 3.*

"If you find, from the evidence, that the calf was in the possession of the defendant at the time, as alleged in the information, this fact standing alone is not sufficient to convict the defendant. I instruct you that the unexplained possession by one of goods belonging to another does not raise the presump-

tion that a larceny has been committed and that the possessor is a thief; additional evidence is necessary to establish the corpus delicti. In this connection, some fact or circumstance of an inculpatory nature must necessarily be shown and proven to your satisfaction beyond a reasonable doubt to characterize the act as unlawful.

"Inculpatory, as used in these instructions is some fact or circumstance *in*tending to establish guilt."

It is contended by counsel for defendant that in the employment of the disjunctive "or" in the phrase "possession or control" in the court's instruction No. 7, rather than the conjunctive, if the word "control" was to be used at all, the jury was privileged to find defendant guilty of larceny if the stolen calves were merely in his control.

The defendant objected to the giving of instruction No. 7 which used the phrase "possession or control" in the following language:

"Court's instruction No. 7, for the reason that such does not correctly state the law as applied to the facts in the above entitled criminal charge."

The objection interposed by defendant to the court's refusal of his specially requested instruction No. 2 was as follows:

"Defendant's requested instruction No. 2, on the ground that such instruction was essential and such correctly states the law as applied to the facts in the above entitled causes."

The record properly before us leaves considerable doubt whether the trial judge ever had his mind directed to the specific vice now said to inhere in the instructions actually given dealing with "possession." We speak of the court's instructions Nos. 6. and 7, especially the latter. Certainly, the minds of defense counsel were not on it when they prepared their objection to it since they do not even mention the claim now made that the conjunctive "and," instead of the disjunctive "or," should have been used in the phrase "possession or control." Furthermore, when they prepared and tendered their specially requested instruction No. 2, the record fails to disclose that it was tendered as a *substitute* for the court's instruction No. 7, something which might have served to rivet the judge's attention on the fact that there was a difference between the two for which he must be on his guard.

However, counsel for the defendant have attached to their motion for rehearing the affidavit of one of their number who participated at the trial asserting that the claimed vice in instruction No. 7 was argued to the judge and a certificate of the clerk that the words "or control" were interlined in ink following use of the word "possession" at each point where the latter word occurs therein is attached to the motion for rehearing. Admittedly, these facts cannot be deemed properly before us as a part of the record on which the case was submitted but we have no desire to dismiss consideration of the matter on that ground.

We think the claimed error is harmless under the facts of this case, even if it be granted that proper steps were taken below to reserve the question for review here. It is our conclusion that the error claimed, under the facts here present, is harmless and could not have prejudiced the defendant in the slightest degree. It will not be disputed by us that if the word "control" was to be used at all it should have been employed in the conjunctive rather than the disjunctive, as it was in the court's instruction No. 6. And it might with propriety have been omitted altogether, as it was in the defendant's requested instruction No. 2. But its improper use in the disjunctive as in the court's instruction No. 7 should not be made the ground of a reversal unless it harmed the defendant and we are satisfied it did not.

Even granting that the word "control" in some circumstances or contexts may have a meaning not synonymous with or incidental to "possession," if not an even

broader meaning, as has been suggested, as well as argued, there cannot be pointed out in the evidence in this case a single place or instance to which the jury might have related the word that does not show it to be a mere incident of possession. In other words, there is here present not the slightest evidence on which the jury could base a conviction by giving the word "control" any meaning not synonymous with, or incident to, the possession actually shown. Indeed, the only control the defendant could have over the animals claimed to have been stolen, under the facts present before the court and jury, necessarily arose as a mere incident to the actual physical possession of them by him which the evidence established.

■ Furthermore, when the instructions are read and considered as a whole any vestige of doubt as to confusion by the jury disappears. That they must be so read and considered, we have many times held. State v. Rodriguez, 23 N.M. 156, 167 P. 426, L.R.A.1918A, 1016; State v. Dascenzo, 30 N.M. 34, 226 P. 1099; State v. Beal, 48 N.M. 84, 146 P.2d 175. In the court's instruction No. 6 the jury were told that "possession and control," standing alone, would not support a conviction. In instruction No. 3, the jury were told they must find beyond a reasonable doubt the defendant "did unlawfully and feloniously take and steal one bull calf, the prop-erty of Victoria Land and Cattle Company, and did thereby knowingly and intentionally deprive the owner of the immediate possession thereof, without his consent," before they could find the defendant guilty as charged. Does any one think in following that instruction, the jury could find the defendant guilty based on some constructive control not flowing from and arising on possession? It does not so impress us, more especially in view of the trial court's instruction No. 14, reading as follows:

"If in these instructions any rule, direction or idea be stated in varying ways, no emphasis thereon is intended by me and none must be inferred by you. For that reason you are not to single out any certain sentence or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole and to regard each in the light of all of the others."

■ Notwithstanding the disposition made of this claim of error, by our conclusion that the use in instruction No. 7 of the words "or control" following the word "possession" is harmless error, at most, under the facts disclosed by the record, we think we should at this time clear up any confusion that may exist in the decided cases on the proper way to reserve error in instructions given in a

situation like the present. The primary purpose of any objection to an instruction is, of course, to alert the·mind of the judge to the claimed error contained in it, to the end that he may correct it. This fundamental purpose must be read into any and all rules on the subject. Our rule on the matter is 1941 Comp., § 19–101(51g), being identical with Trial Court Rule 70–108 and 1941 Comp. § 42–1117. It reads:

"For the preservation of any error in the charge, objection must be made or exception taken to any instruction given; or, in case of a failure to instruct on any point of law, a correct instruction must be tendered, before retirement of the jury. Reasonable opportunity shall be afforded counsel so to object, except or tender instructions."

The court feels there is some confusion in the decided cases on the subject of just when error in an instruction given may be said to have been properly reserved below in a situation such as is disclosed by the record proper before us on this appeal. Therefore, and in order to clarify the situation all of us join in approving certain language in the opinion proposed by Mr. Justice McGhee as a majority opinion in this case, being substantially as found in the next two paragraphs hereof.

■ We believe the correct interpretation of Rule 70–108, supra, is that where the court has not instructed on the subject it is sufficient to preserve the error if a correct instruction is tendered. But, where the court has instructed erroneously on the subject, although a correct instruction has been tendered on the point, if it leaves it doubtful whether the trial judge's mind was actually alerted thereby to the defect sought to be corrected by the requested instruction, the error is not preserved unless, in addition, the specific vice in the instruction given is pointed out to the trial court by proper objection thereto.

Certain of our remarks in State v. Smith, 51 N.M. 328, 184 P.2d 301, and State v. Blevins, 39 N.M. 532, 51 P.2d 599, have seemed to place a different construction on the rule, whereby it has generally been declared possible to preserve error in the court's charge either by specifically pointing out the error in objection thereto, or by tendering a correct instruction. No distinction has been recognized in our decisions between instances where the court did or did not instruct on the point. Therefore, our construction above of Rule 70–108 will be given prospective effect only, beginning with the publication of this opinion in the permanent volume of the Pacific Reporter, in order to protect those who might not be aware of the construction now placed on the rule.

It is next claimed the trial court failed properly to instruct the jury as to the

proof necessary to establish the fact that a larceny was committed. Counsel argue that their requested instructions Nos. 12 and 13 should have been given to cure this shortcoming in the court's charge. We have carefully examined the given instructions as a whole and do not find them wanting in the particular charged. There was no danger, as counsel seem to fear, that under the instructions given, especially those which include excerpts quoted above, that the jury could infer the calves were stolen though they merely became lost and wandered on to the Todhunter ranch and were penned up by defendant with no intent to steal them. This claim of error is wholly without merit.

We are not well convinced that prejudice resulted to defendant from the conduct and actions of spectators in the courtroom in the course of the trial, a claim of error next asserted. The "conduct and actions" referred to, as disclosed by the affidavit of one of the attorneys representing defendant at the trial consisted of a spontaneous demonstration of approval of a point scored by the special prosecutor in his argument to the jury by the clapping of hands, shouting and whistling "in a loud, prolonged and boisterous manner." The affidavit, which was attached as an exhibit to defendant's motion for a new trial, frankly states that the trial judge, arising from his seat, rapped for order and admonished the spectators that if a recurrence of such demonstration took place he "would clear the courtroom of all spectators and others not directly connected with the trial of said cause." The affidavit further states, basing such opinion upon observation and comments made during the course of the trial, that most of the spectators were friends of the cattle growing industry, sympathetic toward the state's case and prejudiced toward the defendant; and, further, that several members of the jury were either engaged in or connected with the cattle industry.

As already observed, it is not made clear that the defendant suffered legal prejudice in view of the prompt and effective manner in which the trial court of its own motion squelched the outburst. Whether so or not, the defendant is not, in position to urge same upon us as ground for reversal. Apparently, at the time, his counsel deemed the prompt and vigorous action taken by the judge cut off any flow of prejudice at its source before it could poison the mind of any juror. In view of the fact that there was no motion for a mistrial or further action of any kind on the part of defendant's counsel, we prefer to view the matter in this charitable light as against thinking there was any disposition on the part of counsel to gamble on a verdict of acquittal.

■ The sufficiency of the evidence to support the verdicts of guilty is made the basis of another claim of error. They are said to be without substantial support in the evidence and could only have resulted from bias and prejudice on the part of the jury. It would serve little purpose to attempt a detailed statement of all the facts and circumstances in evidence supporting the verdicts. Only the state's evidence was before the jury. The defendant, as was his right, declined to take the stand. A careful review of the evidence is satisfying, however, that if believed by the jury, as undoubtedly it was, and with several incriminating circumstances lacking explanation by the defendant, it affords adequate support for the verdicts of guilty returned into court by the jury. Of course, no one actually saw the defendant take the calves into his possession. But that he knowingly did so "with intent to deprive the owner of the immediate possession" thereof, could properly be inferred by the jury from the facts in evidence viewed in the light of the surrounding circumstances. This is all that was necessary. State v. Parry, 26 N.M. 469, 194 P. 864; State v. McKinley, 30 N.M. 54, 227 P. 757; State v. Ortega, 36 N.M. 57, 7 P.2d 943; State v. Reed, 55 N.M. 231, 230 P.2d 966.

This brings us to the point where all errors assigned and argued have been disposed of except those resolved by Mr. Justice McGhee in the opinion proposed by him as to which all were and are in agreement. They will now be taken up and resolved exactly as presented by him in the portion of this opinion to follow beginning with the next paragraph and continuing down to the point herein where we take up a discussion of such of the grounds advanced by defendant's counsel to support the motion for rehearing filed as are deemed material.

Two informations were filed charging defendant with the larceny of the heifer and bull calves. The judge of the district court, Honorable A. W. Marshall, was disqualified by affidavit. By stipulation of the parties Honorable Waldo H. Rogers was agreed upon for the presiding judge in the trial of this case. Prior to Judge Marshall's disqualification he had drawn the regular panel of the petit jury for the term. After his disqualification he drew twelve names to constitute the emergency panel for the term. Upon question being raised as to the validity of this panel Judge Rogers found an emergency to exist and adopted the names drawn by Judge Marshall.

As one of his points on this appeal, defendant urges it was error for Judge Marshall to so empanel additional talesmen and to fix the return day for said panel, the return day being the date set for the trial of this case.

Under 1941 Comp., § 30–121, the drawing of an additional panel of twelve jurors is authorized during "any regular or special term of court, when the business of the court, in the opinion of the presiding judge, can be expedited by the attendance upon the court of more than the regular number of jurors constituting the petit jury panel," to be known as the "Emergency Panel." This emergency panel is to serve with the regular panel of petit jurors for such time as the court may determine and, together with the regular panel of petit jurors, shall constitute the petit jury panel for the trial of cases to all intents and purposes as if the petit jury panel consisted of thirty-six jurors.

Our court has adopted the general rule stated in 30 Am. Jur. under "Judges", Sec. 99, p. 803, that after disqualification a judge may perform mere formal acts. McCabe v. Whitehill, 51 N.M. 424, 186 P.2d 514; State ex rel. Lebeck v. Chavez, 45 N.M. 161, 131 P.2d 179.

As noted in Notargiacomo v. Hickman, 55 N.M. 465, 235 P.2d 531, too frequently attempts are made to trim or stretch the provisions of our disqualification statute, 1941 Comp., § 19–508, to fit some situation which does not come within the fair intendment of the act. It could not have been the intent of the legislature that where a judge is disqualified in one case he may not draw the jury for the term where there are ordinarily many cases to try in which he is not disqualified.

In the instant case the drawing of an emergency panel of jurors for the term and the setting of the date for them to report was not such an act as is prohibited by the disqualification statute. See State v. Nagel, 185 Or. 486, 202 P.2d 640, 646, where the judge was statutorily disqualified and he set the bond, drew the jury panel returnable on a certain day, excused members of the panel and drew additional men to fill the vacancies. The court there said:

"* * * Orders excusing jurors likewise involve the exercise of discretion, but the orders now in question were not made in this case nor in any case. People v. Ah Lee Doon, 97 Cal. 171, 31 P. 933. They were a part of the routine business of the court. * * *"

To the same effect is Driver v. State, Fla., 46 So.2d 718.

In order to facilitate the trial of the case the state moved for consolidation of the two cases against the defendant and the defendant joined in this motion. Thereafter the defendant requested the allowance of five peremptory challenges for each of the cases so consolidated. This request was denied and the court asked the defendant if he would like a severance. The severance was declined by the defendant and he was limited by the court to five

peremptory challenges upon the entire consolidation. The defendant assigns the action of the court in this regard as prejudicial error.

1941 Comp., § 42–1003, provides in part, as follows:

"The state and the defendant in every indictment for a criminal offense shall be entitled to peremptory challenges of jurors as follows: * * * second: In all cases not punishable with death, the defendant shall have five (5) challenges and the state three (3) * * *."

The general rule is stated in 50 C.J.S. § 281(4), p. 1077 under Juries, to wit:

"The fact that an indictment contains several counts does not entitle accused to any additional peremptory challenges, even though the different counts charge separate and distinct offenses which may be joined in the same indictment. This is also true where several indictments charging similar offenses, which might have been charged in separate counts of the same indictment, are consolidated. * * *"

Accord: 3 Wharton's Crim.Proc. (10th Ed.), Sec. 1549; Whitman, Federal Criminal Procedure, Sec. 24.6; 1 Zoline's Federal Criminal Law and Procedure Sec. 280.

The test, then, is whether or not the two informations might have been combined as two counts under one information. In 16 C.J., Sec. 2004, under "Criminal Law," we find:

" * * * it is generally held that, where the offenses charged are of the same class and for the same act, or for connected acts, the consolidation or trying together of indictments is a matter within the sound discretion of the trial court, *especially where defendant consents to or requests the consolidation;* * * * The rule, however, authorizes consolidation only where the offenses charged in separate indictments are such that they might have been embraced in separate counts in one indictment. * * *

"Where several indictments are consolidated for the purpose of trial, they are to be considered as one indictment containing several counts." (Emphasis ours). See also 23 C.J.S., Criminal Law, § 931.

It follows, therefore, that if the separate informations were properly consolidated they would thenceforth be considered as one information containing separate counts.

At common law, as stated in 1 Chitty, Criminal Law, Sec. 253, p. 252, whether or not more than one distinct offense at one time should be charged in the indictment was a "matter of prudence and discretion

which it rests with the judges to exercise." See State v. Brewer, 56 N.M. 226, 242 P. 2d 996. "For, in point of law, there is no objection to the insertion of several distinct felonies of the same degree, though committed at different times, in the same indictment against the same offender." No direct reference can be found as to the precise rule of common law respecting the number of challenges allowable to a defendant where an indictment charged the commission of two or more distinct felonies, but it is interesting to note what is said in 1 Chitty, op. cit. supra, Sec. 535a, regarding the right of several defendants tried together to exercise the entire amount of peremptory challenges each would have had if tried separately—a situation akin to the one presented here—to wit:

> " * * * But when the right of challenging exists, though several defendants are tried by the same inquest, each individual has a right to the full number of his challenges; but if they refuse to join in their challenges, they must be tried separately, in order to prevent the delay which might arise from the whole panel being exhausted."

It would appear that at common law where two defendants were tried together they must join in their challenges or, in the alternative, be tried separately; and, by analogy, we reason that a single defendant would not be allowed to multiply the number of challenges allowed by the number of separate counts against him. Especially is this true under the facts presented here. The defendant specifically and unequivocally declined a severance when it was offered by the court.

A similar situation was involved in State v. Alridge, 206 N.C. 850, 175 S.E. 191, 192, where various bills of indictment were returned against four defendants for conspiracy to assault with a deadly weapon with intent to kill certain persons. The defense moved for allowance of four peremptory challenges under each of the causes so consolidated, and one defendant who was tried on three indictments appealed from the ruling of the court denying additional peremptory challenges. No objection had been entered by defendant to the consolidation of the indictments for the purpose of trial. The opinion states:

> "C.S. § 4622, Michie's Code 1931, authorizes a consolidation of several charges against any person 'for the same act or transaction or for two or more acts or transactions connected together.' In the case at bar no exception is taken to the consolidation of the cases, but the appealing defendant has properly raised the legal question as to whether in such event he was entitled to four peremptory challenges in each of the three separate indictments which formed a consolidated

bill.   C.S. § 4633, Michie's Code 1931, provides: 'And in all joint or several trials for crimes and misdemeanors, other than capital, every person on trial shall have the right of challenging peremptorily, and, without showing cause, four jurors and no more.' The theory of the law is that, when two or more indictments for the same offense are consolidated, they are to be treated as separate counts of the same bill. (Citing cases.) Consequently, if there is but one bill containing several counts, it would seem manifest that a defendant is not entitled to four peremptory challenges on separate counts in a bill, but that he should be allowed four challenges at the trial on the consolidated bill."

In our view, each of the South Carolina statutes set out in the above quotation is substantially declaratory of the common law as seen in foregoing authorities and defendant presents no authority to the contrary. He places great reliance on the case of Betts v. United States, 1 Cir., 132 F. 228, but in that case consolidation of separate indictments fell within the implied prohibition of the statute on which they were based which declared against the combining in one indictment of more than three offenses. Defendant cites other authorities which we do not deem in point for the reason in each of the cases consolidation was either not proper or had not been effected.

It also appeared in two of the cases that joint plaintiffs had each been allowed a full set of peremptory challenges and the defendant was accorded a like number.

The court in its discretion might have granted a severance in the present case wherein the defendant could have exercised the challenges contended for, but the defendant declined the offer of severance and cannot now predicate error on the refusal of the trial court to grant him a duplicate set of peremptory challenges.

Taking up next and finally defendant's motion for rehearing mentioned at the outset in withdrawing our former opinion. The brief supporting motion virtually expends itself in an all out challenge to sufficiency of the evidence to support the verdicts of guilty against defendant based on this postulate, to wit:

"If Mrs. Todhunter actually lived on said ranch, excepting during the period that she was on vacation, then it is submitted that any possession of the calves, whether constructive or otherwise, would have been in the owner of the ranch who actually lived on said ranch, rather than in the foreman of said ranch, who is the appellant herein."

Without attempting in our withdrawn opinion a detailed resume of all the facts in evidence found in an extensive record we there held that such facts afford sub-

stantial support for the verdicts rendered. A reconsideration of such evidence since studying the motion for rehearing and the briefs supporting it confirms us in that view. Indeed, if there is a divided opinion in the court on this proposition it has not yet been advanced as a basis of disagreement. But because in our withdrawn opinion we did not attempt, item by item, to record the several incriminating facts before the jury entitled to consideration, the defendant has boldly asserted the postulate quoted last above, only to be followed by another in like refrain a few pages later in his brief, reading:

"As the defendant has contended throughout this appeal, and again contends below, there was *no evidence* of an unlawful and felonious taking by the defendant. There was *no evidence* that defendant knowingly and intentionally deprived the owner of the possession thereof. In fact, there was *no evidence* which would connect the defendant with the crime alleged in any way *other than the evidence that he was the foreman of the Todhunter ranch, on which the calves were found.* We have searched the record in vain for any such evidence." (Emphasis ours).

Thus it is made doubly plain that counsel for the defendant can see in the evidence adduced not an iota of proof beyond the fact alone that defendant was ranch foreman to connect him with the crimes charged. If such were the case we would be quick to reverse the judgments of conviction standing against him and to order his discharge. But that is not the case, as the record fairly well demonstrates. If, by virtue of the relationship between them as ranchowner and foreman it thereby became legally impossible for defendant to commit larceny of a calf from another if the physical possession essential to conviction had its locale on the Todhunter ranch—if, regardless of criminal intent, any animal taken into defendant's possession on the Todhunter ranch with intent to steal it, or elsewhere and brought there with a like intent—by some legal legerdemain, his possession became transformed into her possession from the beginning, thereby affording absolution to him of all criminal responsibility in the premises, then and only then would these unsupported and unsupportable assertions by defendant be true.

But, of course, there is no such magic in the law. Regardless of his status as foreman, regardless of Mrs. Todhunter's ownership of the ranch, and regardless of the fact, if it should be the fact, that he and she may have been *particeps criminis* in the larceny of these two calves (an implication fairly arising from some statements in defendant's brief), still if the

facts before the jury show defendant's guilty participation in their larceny, the two verdicts against him must stand.

Does it mean nothing to counsel that one of the calves charged to have been stolen was found in a weaning trap, well fenced with barbed wire, which bordered Diamond A ranch at no point whatever? Is it without significance to them, that the jury may have believed the calf was placed in this weaning trap with a "fighter" cow to keep a safe distance away the owner, or some employee of his, seeking to locate the missing calf? Or, that only one familiar with the "fighter" characteristics of the cow, such as defendant, would likely place the calf in the weaning trap with her, some several miles from the calf's mother? Or that, notwithstanding the habit of a calf not to stray away from its mother and her range, the two here charged to have been stolen would have had to travel from 8 to 17 miles distant from their mothers and cross 2 or 3 wire fences, to get where they were found, one of them in a weaning trap securely confined behind a barbed wire fence with a "fighter" cow as company? Does it mean nothing that from July 22, 1950, to September 1, 1950, the defendant was alone on the ranch while Mrs. Todhunter was vacationing in Hawaii, save for the presence there of two boys, 11 and 12 years of age, respectively, sons of neighboring ranchers, all or a portion of the time?

The evidence disclosed that defendant was in full charge of the ranch as foreman. Mrs. Todhunter, the owner, depended entirely upon him to look after the ranch. She furnished him with a pickup truck and horses and he had been oprating the ranch, branding the cattle, of which there were 28 head on the ranch belonging to him and performing many other varied duties in and about the ranch. There were no other employees on the ranch from June to September except defendant and, as already indicated, no other person on the ranch from July to September, save the two young boys, 11 and 12 years of age, respectively, who visited him there all or a portion of the latter period. The gates along pipe lines crossing the ranch were kept locked, though cattle guards were provided near them whereby automobiles and auto trucks could cross at will.

The calves which defendant is charged with stealing sucked Victoria ranch cows upon contact with them. The evidence from experienced cattlemen, familiar with the characteristics of cattle was that calves would not suck a cow unless it were her calf without being trained to do so. In addition to this proof of ownership one of the heifer calves involved was identified by employees of the Victoria ranch by its bobbed tail and by being personally recognized by them through other identifying marks. Add to these facts that of the discovery on Vic-

toria ranch of some wet cows with enlarged bags soon after the roundup on the Todhunter ranch, two of which cows, as stated above, mothered the two calves caught in the roundup which are now the subject of these two prosecutions.

It was also in evidence, without objection, that 101 calves not belonging to the Todhunter ranch, of which the two involved constituted a part, were caught in the roundup. It developed, however, that two of the 101 mentioned were mothered, one by a Hightower cow and one by a Victoria cow, among the cattle rounded up. This left 99 calves of which the two the subject of these prosecutions were a part. The remaining 97, being calves without mothers, were sold by the Cattle Sanitary Board as unclaimed animals. Although 41 of the 97 head bore Mrs. Todhunter's brand she would not claim them, giving as a reason that she feared prosecution if she did so. Three heifers and two bull calves were unmarked and the remainder of these unclaimed animals were heifers each having a cropped left ear, the ear mark used by defendant, and as well by a good many other ranchers.

There was no explanation of the presence on the Todhunter ranch of these 101 motherless calves, except as to the two mothered by the Hightower and Victoria cows at conclusion of the roundup. The jury was left to draw its own conclusions. Mrs. Todhunter admitted she had never had as many as 101 calves over and above her normal production crop and that she had a normal production crop in 1950. And by the same token the jury was left to its own conclusions, no explanation being forthcoming, as to how a shortage of 74 to 84 head of cattle lost by Mrs. Todhunter from her ranch from the previous year, to which she testified without objection, took place. She testified this large number of cattle were missed during the period of defendant's employment on her ranch.

Throughout their argument counsel for defendant have by suggestion and innuendo intimated that there was equal opportunity for these larcenies, if there was a larceny, to have been committed by Mrs. Todhunter, owner of the ranch and defendant's employer. The fact that she declined to claim any of the 101 head of motherless calves found on her ranch, 41 of them bearing her brand, is, of course, a puzzling factual situation. Counsel do not go so far as to assert she is the guilty party. It seems to us, without passing judgment on the unnatural, if not unexplainable, attitude on her part (beyond her testimony that two members of the Cattle Sanitary Board told her she would expose herself to prosecution if she did claim any of these unclaimed animals) that if any inference at all could be drawn from these facts against Mrs. Todhunter, it would be merely that she was *particeps criminis* with the defendant. Her guilty

participation, if any, would not shield him from prosecution and punishment.

We conclude, as we did in our former and withdrawn opinion, that the facts before the jury were sufficient to support the verdicts of guilty, if the jury chose to draw inferences permissible under such facts. The jurors, no doubt, felt the facts were strong enough to call upon him to offer explanatory evidence to counter them, which he preferred not to do in the exercise of a constitutional right and privilege accorded him. Nevertheless, he cannot justly complain if the jury drew inferences unfavorable to him under the circumstances.

· It is strenuously argued by counsel for defendant that the case of State v. White, 37 N.M. 121, 19 P.2d 192, is decisive of this one and calls for a reversal and remand with a direction to discharge the defendant. We do not agree such is the case. We see a difference in the facts. There, the occupant of the ranch on which the butchered cow and her hide were discovered was found guilty and a judgment of conviction against him was sustained. There as here, true enough, no one saw him steal the cow or butcher her, but the facts were strong enough to support a verdict that he did so. The owner of the ranch, cousin of the one whose conviction we affirmed, was a co-defendant. Unfortunately for the State, however, he could not be placed nearer the scene of the crime, at or near the time of its commission, than four miles. Under such a state of facts we ordered a reversal as to him with a direction for his discharge. On the other hand, we affirmed the conviction of the cousin whom the facts more nearly likened to the present defendant from the standpoint of his ability to commit the crime charged.

There are other facts present in the evidence which, in varying degree, tend to support the verdicts rendered. It would unduly lengthen this opinion to attempt to recite them in full. Enough has been shown, we think, to demonstrate that the verdicts returned against defendant are not without adequate support in the evidence. The jury, from the evidence, may very well have felt that this ranch was the scene of cattle stealing on a scale rarely encountered, with enough incriminating facts disclosed to pin point on defendant responsibility for the two larcenies charged against him.

It follows from what has been said that the motion for rehearing should be denied and that our previous order of affirmance should stand.

It Is So Ordered.

COORS and LUJAN, JJ., concur.

McGHEE and COMPTON, JJ., dissenting in part.

McGHEE, Justice (dissenting in part).

The majority grudgingly admit, as I read their opinion, the error in the instruction containing the words "possession or control" was sufficiently pointed out to the trial judge to preserve the point for review here, but they save the case from reversal by sitting in their cloistered chambers in Santa Fe and concluding from the cold record the error was harmless, in that it could not have affected the verdict of the jury. Clearly such was not the appraisal of the judge who tried the case or he would not have taken an old stock instruction like No. 7 was before he interlined "or control" and changed it as he did, thus risking a reversal.

As stated by this Court in State v. White, 1933, 37 N.M. 121, 19 P.2d 192, possession of the fruits of crime to raise a presumption of guilt of the possessor involves knowledge, dominion, and control, with power of disposal, or voice in the power of disposal, in the alleged possessor.

The word "control" does not necessarily include actual possession. Possession is defined in 72 C.J.S., Possession, p. 233, as "the closest relation of fact which can exist between a corporeal thing and the person who possesses it * * *. In its full significance, 'possession' connotes domination or supremacy of authority. * * * Possession involves power of control and intent to control, and all the definitions contained in recognized law dictionaries indicate that the element of custody and control is involved in the term 'possession.' "

In 18 C.J.S., Control, P. 28, et seq., the term "control" is considered, and the words listed therein as equivalents or synonyms are: Custody, government, management, superintendence and supervision.

The definition of the phrase "possession, custody, or control" was pertinent to the decision of People v. Britton, 1909, 134 App. Div. 275, 118 N.Y.S. 989, 933, where the defendants had been convicted of grand larceny. That phrase appeared in the section of the penal code under which conviction was sought. The court ruled that the conviction should stand although the defendants had not been in actual possession of the stolen funds of a corporation. The court said:

" * * * If physical possession was required, the words 'custody, or control' are meaningless, and plainly those words are not used synonymously with 'possession.' According to the lexicographers, physical possession is not essential to custody or control. One may have the custody, the care, the guardianship of, and may exercise control over, what is not in his physical possession. A bank president, by virtue of his office, may have the custody and control of the bank's money, al-

though none of it passes through his hands. * * *"

Similarly, in Randazzo v. United States, 8 Cir., 1924, 300 F. 794, 797, defendants appealed from conviction of robbery of mail bags from a person in the lawful charge, control and custody of the United States mail. The court in defining the terms "charge, control, or custody" stated:

"* * * As already indicated, the words 'lawful charge, control or custody,' as used in the statute, have no technical meaning; they are used in their plain and ordinary significance. The word 'charge,' when used, as here, as a noun, has as one of its synonyms 'custody.' Both words connote, not only control, but include as well, though they do not require, the element of physical, or manual possession. The word 'control,' as used in this statute, is a slightly broader word, in that it lacks the implication of physical possession. * * *"

In my view the terms "possession" and "control" may not be used synonymously or in an alternate sense with respect to describing the relationship between an accused and the subject of larceny requisite to raise a presumption of guilt. I believe the jury would have been justified in inferring that the defendant would be guilty of the crime charged upon a showing the defendant had the mere control of, or right to control, the pastures in which the heifer and bull calves grazed. In the range country of New Mexico I believe it is commonly accepted where one has the right to eject livestock belonging to others, such person has control of the range and animals grazing thereon. The jury may well have believed the mere fact the defendant was the foreman of the ranch and in sole charge thereof gave him the right to turn the calves out of the Todhunter pastures, and that this one fact was sufficient basis on which to find he was in "control" of the calves, and therefore a verdict of guilty was really directed by instructions No. 7.

The evidence revolves around possession, and it is barely sufficient to sustain the verdict under correct instructions. No conviction for larceny based on possession has heretofore been sustained by this court on the quantum of proof present in this case. The statement that either possession or control was sufficient in the hostile atmosphere in which the defendant was tried may well have had a devastating effect on the defendant's case, as there was no question but that the calves were in a pasture of which he had control in his position as foreman of the ranch.

The error as to control is, I believe, highly prejudicial, because the gist of the state's case under these and similar facts is *possession*—not control, or the right to control. As above stated, I believe instruction No. 7

amounted to a directed verdict of guilty. Accordingly the defendant should be granted a new trial.

I concur in the remainder of the majority opinion.

COMPTON, J., concurs.