No. 33,664

MABEL WILLIAMS, *Appellee,* v. KANSAS CITY PUBLIC SERVICE COMPANY, *Appellant.*

(78 P. 2d 41)

Opinion filed April 9, 1938.

*Edwin S. McAnany, Thomas M. Van Cleave, Willard L. Phillips, Bernhard W. Alden,* all of Kansas City, and *Charles L. Garr,* of Kansas City, Mo., for the appellant.

*David F. Carson* and *Russell L. Stephens,* both of Kansas City, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This was an action for damages for personal injuries alleged to have been sustained by plaintiff because of the negligence

of defendant's motorman in closing the doors of a streetcar upon her as she was boarding the car. The jury answered special questions and returned a verdict for plaintiff for $1,000. Defendant has appealed, and contends: (1) there is no evidence to support the answer to the sixth special question; (2) that the verdict is excessive, and (3) that the court erred in refusing to permit the jury to inspect the streetcar.

The streetcar in question is of standard size, operated by one man, whose station is in the front of the car near the door. The door space is four feet wide, divided into two parts, one for entrance, the other for exit. An iron railing divides the two aisles, and in the center of the opening, a few inches inside the door, this railing fits into an iron pole extending from the floor of the car to the roof and serving as a handhold to assist passengers boarding or leaving the car. There are two doors, one covering the entrance half of the door space, the other the exit half. Each door consists of two 12-inch panels, and these are joined together with hinges. The doors fasten to the edge of the opening with hinges, and the inside edge of the door is fastened to the car at the top by rollers, which fit in a runway. The inner edge of each door is covered with a soft rubber bumper three inches in width. When each door starts to open, the front end thereof, guided by the rollers in the runway, moves toward the side of the car. The center pushes out, and when the door is completely open the panels are folded together at right angles to the side of the car. Both doors move at the same time and are connected with a step in such a manner that as the doors open the step moves down into a horizontal position to permit entrance or exit, and as the doors close the step folds up against the side of the car. The doors and the step are under the control of the motorman, who by means of a lever sets in motion the operating machinery. The force moving the doors is air, operating on a six-pound air pressure.

As to how the injury occurred, plaintiff's evidence was to this effect: She is a colored woman, was thirty-one years old, weighed 110 pounds, and was employed in the sewing room of the WPA. On the morning in question, October 29, 1935, she and others boarded defendant's streetcar at Third and Minnesota avenues, she being the last one to get on, and as she was boarding the car the operator negligently closed the doors, catching her between them, crushing her and inflicting serious injuries to her chest, back and arms.

Special questions asked the jury as to the manner in which plaintiff was injured, and their answers, are as follows:

"4. Can the front doors of defendant's streetcar No. 619 be closed while a person is standing on the front step?  A. No.

"5. Was the plaintiff caught between the front doors of the defendant's streetcar while she was standing with both feet on the front step?  A. No.

"6. If you answer the foregoing question 'No,' but find she was injured, state where she was standing or what she was doing at the time she was hurt. A. While she was in act of stepping from the step to the platform, she was caught between the doors.

. . . . . . . . . . . . . . .

"9. If you find a verdict in favor of the plaintiff, state each act of negligence of which you find the defendant's operator guilty.  A. He closed the door before plaintiff was in safely."

We now look at the record to see if there is evidence to sustain the jury's answer to question No. 6.  Plaintiff testified that as she entered the streetcar—

"The door closed on me; and I dropped my arm; and I stand until he say, 'Oh, I liked to close the door on you.'  And I said, 'You did close it on me.'  And he released it and continued to talk to somebody behind him."

On cross-examination the witness testified:  "You makes two steps to get in the car."  Counsel for defendant brought out that there was but one step and then the platform, and sought to illustrate by the steps in the courtroom to the witness stand.  The witness stated she did not understand.  She did say, in a part of her cross-examination, that at the time she was caught by the doors of the car she was standing on the step with her heels near the edge of it, tilting back.  Since the witness repeatedly spoke of there being two steps, the jury might very well have concluded that she was referring to the second step as the place she was standing when the doors caught her, which place was referred to by counsel for defendant as the platform, although perhaps the specific questions and answers would bear or require the interpretation that she was standing on what she called the first step and which defendant's counsel spoke of as "the step."  If her answers were in conflict as to just where she was standing at the time the door closed on her, there is other evidence which justified, even required, the jury to find that she was standing on what she called the second step, or what defendant's counsel referred to as the platform, or at least that she had stepped on to that step or platform so that her weight was not on the step which raises and lowers as the doors are closed or opened.  There was evidence that the step could not be raised with a person standing on it, and the jury so found.  A witness, called by plaintiff, testified:

"I was seated on the long seat near the front door on the right side. I was looking out the window, and I saw these people come running towards the streetcar. . . . And I hollered, 'Look out—you're going to hurt that lady!' When I seen them all get on only her, and he went to shut the door just as she clumb up. He didn't shut it good, until she got in. It kind of crushed her, up that way. I hollered just as she was in it. It scared me."

We think it cannot be said there was no evidence to sustain the jury's answer to special question No. 6. It is consistent with the answer to question No. 9, and with the general verdict.

Was the verdict excessive? Plaintiff testified that when she walked to her seat, after being released from the doors of the car, there was a numbness in her arm and hand. It appears she went to the sewing room that morning, but did not work. At noon she consulted a doctor. He testified that she complained of a hurting and soreness throughout the chest and back, with more or less in the right arm. He examined her and found no bruises. She did have muscular spasms, indicative of some injury. There was considerable tension throughout the chest and back. She had what the doctor described as an uncontrolled rigidity or tension. He strapped her back to control the muscles, and strapped her arms down, and gave her infra-red radiation treatment; also some ointment to use. She went home and went to bed and called the doctor again that evening. He found her spitting blood and complaining of excruciating pain in her chest, which was extremely tender. The condition in which he saw her was not one which would clear up quickly. It might take six or eight weeks, depending on the type of treatment she had. The next day he treated her at his office. On November 2 he saw her and treated her twice, once at his office, and was called to her home in the evening. She consulted Doctor Faust first on October 31. He found she had a numbness in her right arm, pain in her chest, and was spitting blood, and was quite nervous. For some reason, which he was unable to explain, he was unable to get blood pressure reading from her right arm. He gave her some treatment. She came back November 12 and was still spitting blood and having pain in her chest. The chest was strapped. The gripping power of her right hand was below normal. He treated her again on November 21. The trouble had not cleared up. He next examined her on January 20, 1937, shortly before the trial of this case. She had not then recovered from her injuries. She had pain in her back and right arm. At defendant's request three physicians were appointed by the court to examine plaintiff at the time of the trial.

They made a thorough examination of her, which included X rays of the chest. They found the entire right upper extremity had a partial anesthesia for pain; that is, a pin could be stuck into the skin on her hand, forearm, arm, shoulder, side of her neck down to the level of the upper part of her breast, and she could not tell whether it was the point of the pin or the head of the pin. In addition to that she had a slight fever. The motor nerves seemed to be in very good shape. She had a very good grip in her hand, but the sensory nerves were not functioning. In the opinion of the physicians this resulted from trauma, and, answering hypothetical questions, that resulted from her being struck or squeezed by the doors of the streetcar. From this testimony we cannot say the verdict is excessive. It is true, as pointed out by appellant, that plaintiff's testimony in some respects was not consistent. Some of it the jury obviously did not believe. It is also true that her health was not good in other respects, but perhaps this did not affect the condition of her shoulder and chest. It was the function of the jury and the trial court to consider all this evidence, the credibility of the witnesses, and the weight to be given to their testimony. There is nothing in the record to indicate this was not fairly done. Certainly the verdict is not so large that this court should disturb it as a matter of law.

Early in the trial defendant's counsel advised the court that it wanted permission to have the jury inspect the streetcar. After some discussion the court indicated that it might be an advantage to the jury in understanding the testimony to see how the doors of the car operate. At the close of the taking of testimony defendant's counsel called the court's attention to this and asked that the jury be permitted to inspect the streetcar. The court stated in substance that he thought the evidence was sufficient to give the jury a clear idea of the structure of the car, and the request was denied. Appellant contends this ruling was erroneous. Our statute (G. S. 1935, 60-2910) in substance provides that whenever, in the opinion of the court, it is proper for the jury to have a view of the property in controversy, or the premises where a material fact occurred, it may order the jury to be conducted to the place. It is the rule that whether a request for such a view should be complied with rests in the sound discretion of the court. (*Rudy v. Headley*, 103 Kan. 417, 173 Pac. 913; *Gartner v. Williams Oil & Gas Co.*, 125 Kan. 199, 263 Pac. 778; *Fitch v. State Highway Comm.*, 137 Kan. 584, 21 P.

2d 318.)   After the request was first made in this case defendant called as a witness its motorman who was operating the car at the time in question, and he described fully the car, the doors thereon, and how they were operated.   The answers of the jury to special questions indicated the jury thoroughly understood the structure of the car, the doors and step, and how they operated.   It is not now pointed out that the jury could have learned anything more by an inspection of the streetcar than they did learn from the evidence offered.   We see no reason to say that the trial court abused its discretion in this respect.

We find no error in the case.   The judgment of the court below is affirmed.