285 P.2d 507

James Patrick THOMPSON, a minor, by James B. Thompson, his father and next friend, Plaintiff and Appellee,

v.

George ANDERMAN, Percy P. Glasebrook and Joseph Land d/b/a Albuquerque Bus Company, Defendants and Appellants.

No. 5834.

Supreme Court of New Mexico.

May 18, 1955.

As Amended on Denial of Rehearing July 1, 1955.

Motion for Leave to File Second Motion for Rehearing Denied July 18, 1955.

Rodey, Dickason, Sloan, Mims & Akin, James C. Ritchie, Albuquerque, for appellants.

Joseph L. Smith, Lorenzo A. Chavez, Arturo G. Ortega, Albuquerque, for appellee.

LUJAN, Justice.

James Patrick Thompson, a minor, by James B. Thompson, his father and next friend, brought suit against George Anderman, Percy P. Glasebrook and Joseph Land doing business under the name of Albuquerque Bus Company, to recover damages for injuries sustained by said minor, as a result of the alleged negligence of defendants. The jury, for their verdict, answered the issues in favor of the plaintiff, and, from a judgment entered in accord therewith, the defendants appeal.

For convenience we will refer to James Patrick Thompson, a minor, as the plaintiff and to the defendants as the Bus Company.

The complaint, among other things, alleges:

"2. That at about 3:40 p.m., on May 28, 1953, the minor James Patrick Thompson was a passenger for hire on one of the buses operated by the defendant and driven by its agent, servant and employee in the course and scope of its business as a common carrier; that said bus was traveling in an easterly direction on a public thoroughfare designated as Lomas Boulevard N.E., at its intersection with LaVeta Street N.E., when defendants' agent, servant and employee partially completed a left turn from Lomas Boulevard N.E. to LaVeta Street N.E., and negligently parked defendants' bus with its rear end approximately six feet on the paved portion of Lomas Boulevard N.E., without the giving of any signal or warning of his intention of so parking, and immediately thereafter permitted the minor, James Patrick Thompson to alight from the rear door of said bus in the middle of the paved portion of Lomas Boulevard N.E.

"3. That the defendants negligently failed to stop their bus at the regular bus stop off the highway in a place of safety for the purpose of discharging the minor, James Patrick Thompson, but instead of doing so chose to invite him to alight from the bus on the paved portion of the highway when defendants knew or should have known that

heavy vehicular traffic was approaching in such a way as to endanger him as he stepped upon the pavement and when, had the defendants' agent, servant and employee looked with any care to the rear, he must have seen the 1950 model *Doge* one-half ton truck which collided with the minor an instant after he alighted from the bus in the middle of Lomas Boulevard N.E.

"4. That as a proximate result of the negligence of the defendants and each of them in breaching their duty to furnish James Patrick Thompson a minor, a safe place in which to alight under the circumstances and in failing to give any warning of their intent to park their bus on the paved portion of the highway to the minor James Patrick Thompson or any person lawfully traveling on said public thoroughfare including the driver of a 1950 Dodge one-half ton truck, Robert Dean Becker, who was proceeding in an easterly direction on Lomas Boulevard N.E. immediately behind said bus, the minor James Patrick Thompson was struck by the left front of the Becker truck and thrown to the pavement with great force and violence.

"5. That as a further proximate result of defendants' negligence as aforesaid, James Patrick Thompson, a minor, has been confined in the Bataan Memorial Hospital in a semi-comatose and critical condition with a basal skull fracture, cerebral concussion, brain stem damage and chest complications due to bleeding together with extreme mental and physical shock.

"6. That James Patrick Thompson, a minor, has and will sustain severe physical and mental pain and anguish and has sustained injuries to the brain and nervous system which are permanent in nature and has and will incur bills in large sums for neuro-surgeons and medical specialists and hospitalization, all to plaintiff's damage * * *."

The answer denied the allegations of the complaint and pleaded as an affirmative defense contributory negligence on the part of the plaintiff.

The accident occurred on May 28, 1953, at approximately 3:30 p.m., in Albuquerque at about the intersection of Lomas Boulevard N.E., and LaVeta Street N.E. Lomas Boulevard is twenty-eight feet in width, with dirt shoulders on each side, approximately twenty feet wide, and runs east and west. LaVeta Street which intersects it, is estimated as being thirty-four feet wide, running north and south. There is no path at this intersection for pedestrians to cross Lomas Boulevard. A barricade, eight feet and one inch long, was placed

in the middle of LaVeta Street, at the north end, with a clearance on each side of about ten or twelve feet to allow traffic to go by. The regular stop for busses was approximately sixty or seventy feet from the intersection of aforementioned streets. The plaintiff was a passenger for hire on this particular bus which he boarded at the corner of North Carlisle and Lomas Boulevard. When the bus reached the intersection of Lomas Boulevard and LaVeta Street it was temporarily stopped facing the east, then it proceeded to turn onto LaVeta Street and it stopped at a 45-degree angle on the north traffic lane of Lomas Boulevard, the back end of the bus being about six inches from the center line thereof, and the plaintiff was permitted to alight therefrom. The place for entrance is at the forward part of the bus, and the place for exit is at the rear of the bus. The doors are opened and closed by a lever under the control of the motorman. When the bus stopped as aforesaid, the door opened and the plaintiff jumped out and ran approximately two or three feet over the center line on the south side of Lomas Boulevard into a pickup truck, which was traveling in an easterly direction, and was severely injured.

The evidence discloses the following facts:

Mr. Nichols Melancon being called as a witness for the plaintiff testified in substance as follows: That he was a passenger on the bus which carried the plaintiff; that as the bus was going east on Lomas Boulevard, the street was blocked, due to repairs, and that the bus stopped in the center of the street.

"* * * Q. Just what—tell us what you saw. A. Well, as the bus was going east on Lomas Boulevard, the street was blocked, due to repair, and the bus stopped, I suppose you would say the center of the street.

"Q. The center of what street? A. Lomas, heading east, and he hesitated a moment, and there was an indication from the crew that the street would be open in a short time, so he turned north on LaVeta. That is, he didn't get onto LaVeta, the end of the bus was still on the pavement, and prior to him moving on, from the center of the street, the boys asked him if he would open the door and let them out. The bus driver said 'No, I can't let you out, here.' However, after he moved from the center of the street, going into La Veta, as he stopped, he opened the door, and—(Interrupted)

"Q. Which door did he open? A. The back door.

"Q. And did he actually converse with the boys, in your hearing? A. Not after he opened the door.

"Q. Did he converse with them, when they asked him to let them off the bus? A. Yes, he did.

"Q. And in what manner was he requested to open the door? A. The boys just said 'Open the door and let us out,' and he said 'I can't open the door, here,' and then he moved, and then the door opened.

"Q. And did he open the door? A. To my knowledge, he did open it.

*     *     *     *     *     *

"Q. And then what happened? A. There was three boys standing in the doorway, and the largest one of the boys ran out, and was struck by a pick-up truck.

*     *     *     *     *     *

"Q. Did you hear the bus driver make any other comment, at the scene of the accident? A. He went over, and used the telephone, and got back on the bus, and he said 'How did the boy get off the bus, did he get out the window?' He said he didn't open the door.

"Q. He said that he did not open the door? A. That was his statement." On cross-examination he testified:

"A. From where I was sitting, I could not see whether he opened the door, or not. However, I have ridden busses quite a lot, and whenever you hear the air release, and the click, the door opens. And that is what happened in this case, the door opened."

Bobby Roeder, called by the plaintiff, testified substantially as follows: That when the bus reached Lomas Boulevard and LaVeta Street the bus driver stopped at about the middle of Lomas Boulevard and that the plaintiff yelled to be let off; that the bus driver opened the door; that plaintiff ran out and the truck hit him.

Charles Cope, testified substantially as follows: That the bus was turning into LaVeta Street; that there was a road block there, so the bus driver had to stop the bus; that plaintiff asked the bus driver to please open the door and let him out; that the bus driver opened the door and plaintiff ran out without looking where he was going, and then was struck by the truck.

Donald Jones testified that the bus stopped at about the middle of Lomas Boulevard just as it was turning onto LaVeta Street and let plaintiff off.

W. V. Freeman testified that he was riding with his wife on Lomas Boulevard at the time of the accident; that they were about 100 feet behind the pick-up truck that was immediately behind the bus; that when the bus reached LaVeta Street it turned on said street and stopped at an angle with the back end of the bus about six inches to a foot from the center of the street; that within a second or so the plaintiff started running south across Lom-

as Boulevard and ran into the pick-up; that the boy fell about two or three feet south of the center line on Lomas Boulevard; that the day was clear but the wind was blowing; that there was no traffic coming from the east.

Mrs. Freeman testified that she was driving the family car in an easterly direction on Lomas Boulevard; that as they were coming up Lomas Boulevard she saw the bus stop in a very unusual position, and said to her husband that she wondered what the bus was doing there; that ahead of her, about one hundred feet ahead there was a red pick-up truck following the bus; that, just as the truck got up to the bus, the boy came across the street and ran into it; that he had taken two or three steps when he ran into the truck; that it happened so quickly; that there was no westbound traffic on lane at that time.

Robert Cole testified that as he was driving on Lomas Boulevard he saw the bus stopped, at approximately the center of the street, to make a left-hand turn onto La-Veta Street; that it was stopped with the front end headed north and blocking the west side of the traffic lane; that he was too far behind the bus to see the accident.

Emerson L. Ballinger, the driver of the bus testified on cross-examination, as follows:

" * * * Q. Did you ever see any traffic close behind you, when you made the turn and stopped? A. Yes, there were traffic behind me.

"Q. How close? A. Well, I would say twenty to twenty-five feet, maybe. Now, that is my estimation."

Under point one the Bus Company contends that "since plaintiff alighted from defendants' bus at a reasonably safe place, the defendants' bus company breached no duty towards plaintiff and was not thus negligent." It argues that because the whole westbound lane on Los Lomas Boulevard was blocked by the rear of the bus, it afforded the plaintiff protection from any eastbound traffic approaching in the wrong lane, and a place where he could have remained with perfect safety for a reasonable amount of time, and that, therefore, he was just as safe as he would have been had. he alighted at the regular bus stop. This contention is untenable.

The passenger in the case at bar was not too bright a lad who had the mentality of a ten year old, and even if it could be said that the place where he was permitted to alight would be safe for a normal adult, it does not necessarily follow that it was safe for a young person. Cases involving a normal adult, which might be cited as showing that the bus company would not be liable, are not determinative of the present issue, unless it could be said that a place of safety (six inches to a foot from the center line of the street) is one wherein

a person would come to no harm if he remained in it, and that it must not be measured by any consideration of competence or ability of one deposited in a given place to emerge therefrom without subjecting himself to hazards of the environs. If, however, the passenger had been an adult it might have been asserted that it was a safe place. But if one leaves a young child at the same spot, and in its immaturity it ventures to cross the street in the line of traffic and is run over and injured by a motor vehicle, could it then be reasonably said that the child had been put in a place of safety? These considerations impel us to the conclusion that it would be too narrow a construction to say that the safety of a place must be determined solely by whether or not one would be safe if he remained in it. We find no exactly parallel case in the reports of this state and a few decisions in other jurisdictions which are of aid. Two of the latter may be noticed.

In Roden v. Connecticut Co., 113 Conn. 408, 155 A. 721, 722, the plaintiff was a boy of seven years of age, and at the end of the run of the bus was discharged on the side of the street opposite that where his home was located. The operator stopped the bus in such a way that part of it was on the shoulder of the road. Passengers could pass out only from the right side of the bus. In descending the steps to the road he was struck by a passing motor truck, and it was held that the driver had not exercised the proper care towards him. It was said:

"The duty of a common carrier of passengers includes an obligation to furnish them a safe place in which to alight, as far as that place is provided by it or is affected or conditioned by the movement of the vehicle, and that duty is only satisfied if it exercises the highest degree of care and skill which reasonably may be expected of intelligent and prudent persons engaged in such a business, in view of the instrumentalities employed and the dangers naturally to be apprehended. * * * An automobile bus is able to move or stop in the street at the will of its driver, and the safety of the place he offers its passengers to alight may be affected or conditioned by the passing traffic. * * * The care to be exercised toward a young child traveling by himself must be proportioned to the degree of danger inherent in his youth and inexperience."

In Taylor v. Patterson's Adm'r, 272 Ky. 415, 114 S.W.2d 488, 490, the driver discharged a seven year old boy on the side of a street necessitating his crossing a very busy street to reach his home, and he was injured by a passing truck. In the opinion it was said:

"If Patterson (the plaintiff's intestate) * * * had been an adult

of mature years and in possession of the faculties of a normal adult, the court would have no trouble in reaching a conclusion quickly as to the liability of Taylor (the jutney bus operator), but we have here a child passenger to deal with; under seven years of age, just returning from school, full of life, with great anxiety, no doubt, as is usual in a child of that age, to reach his home and mother quickly, possibly his childish appetite was gnawing heavily, and his thoughts only upon things of that character and not upon the dangerous surroundings that were obvious to an adult, and possessing at that age but little discretion or judgment or ability to perceive surroundings or situations that would produce injury or death, should he undertake to cross the street. This condition of the child passenger was known to Taylor, as was also the heavily traveled street, and the danger in crossing same to reach the home of the decedent was necessarily obvious and plain to be seen by appellant. Such a state of facts as that differentiates this case from the situation of an adult passenger. * * * Under the proof Taylor failed to discharge Patterson, a boy of his age, at a place of safety, even if the sidewalk where he was discharged was safe *had the boy remained there.* A 'place of safety,' as contemplated by the courts

in considering such a phrase, is such a place as the passenger may use and occupy with relation to the place of destination fixed under the contract of carriage, and in discharging the boy on the side of the street opposite his home, although he would have been safe if he had remained there, the appellant did not select a safe place to discharge him, as he was required to take into consideration the location of the place of destination, his home, the age of the boy, and the known hazards to be encountered in crossing the street to the boy's home, the place of destination." (Emphasis ours.)

■ In the present case should the driver, knowing the dangers incident to the heavy vehicular traffic on Lomas Boulevard, which he had traveled six or seven years, have driven the bus off of the paved portion of the street and onto the shoulder so that the young boy could have alighted where he would not hazard the street? Was the place where he was in fact allowed to alight a place of safety for one of his years? Was the driver under the circumstances of the case negligent? If so, the defendants are liable for the driver's negligence. These questions were all for the determination of the jury, and under the evidence we think that they were authorized to find that the driver of the bus was negligent, and that his negligence

proximately caused the injury and damage to the plaintiff.

■ In allowing this boy to alight from the bus at a place where he did, the driver was bound to bear in mind the characteristics of young children in respect to their non-appreciation of danger, and reasonable care on his part under the circumstances required greater care to avoid injury to them than if they were adults better able to help themselves.

The case of Cavazos v. Geronimo Bus Lines, 56 N.M. 624, 247 P.2d 865, relied on by the Bus Company as controlling in the case at bar, was so decided because the plaintiff in that case was not discharged at an obviously perilous point. Here the plaintiff was discharged at an obviously perilous point, the middle of the westbound traffic lane. In that case the passenger was an adult. The proof there was that the operator of the motorbus at the request of the passenger stopped on the right or westerly side of the highway opposite its station with the left wheels remaining on the paved portion of the highway some four feet. He was let off at that point which was on the shoulder of the highway, which was perfectly safe. He walked to the rear of the bus and started across the highway behind the bus for the purpose of going east towards Lemitar, a small community, when he was struck and fatally injured by Marvin J. Johnson, who was traveling in a northerly direction. The bus was placed, so far as the exit door was concerned, so that the passenger could and did alight on a sound gravel shoulder, not on but away from, the paved or traveled portion of the highway.

Under point two it is contended that "even if defendant bus company was negligent, such negligence was not the proximate cause of plaintiff's injuries." Here the bus company argues that the intervening independent action of plaintiff in running across Los Lomas Boulevard from his place of safety into the path of the truck was the proximate cause of his injuries rather than the negligence, if any, of the bus company.

■ The proximate cause of an injury is that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, and without which the injury would not have occurred. Maestas v. Alameda Cattle Co., 36 N.M. 323, 14 P.2d 733; Silva v. Waldie, 42 N.M. 514, 82 P.2d 282.

■ What intervening cause will break the chain of sequence and so far insulate the first wrongdoer's negligence from injury as to relieve such wrongdoer? The independent intervening cause that will prevent a recovery of the act or omission of a wrongdoer must be a cause which interrupts the natural sequence of events,

turns aside their cause, prevents the natural and probable results of the original act or omission, and produces a different result, that could not have been reasonably foreseen. The concurrent or succeeding negligence of a third person which does not break the sequence of events is not such a cause, and constitutes no defense for the original wrongdoer, in the absence of the concurrent or succeeding negligence, the accident would not have happened. Reif v. Morrison, 44 N.M. 201, 100 P.2d 229; Valdez v. Gonzales, 50 N.M. 281, 288, 176 P.2d 173.

In 45 C.J. p. 926, § 489(f) the rule is stated as follows:

"It is well settled that the mere fact that other causes, condition, or agencies have intervened between defendant's negligence and the injury for which recovery is sought is not sufficient in law to relieve defendant from liability. In other words, an intervening cause will not relieve from liability where the prior negligence was the efficient cause of the injury. The test is not to be found in the number of intervening events or agencies, but in their character and in the natural connection between the wrong done and the injurious consequences, and if the injury is the natural and probable consequence of the original negligent act or omission, and is such as might reasonably have been foreseen as probable, the original wrongdoer is liable, notwithstanding the intervening act or event." See, also, 65 C.J.S., Negligence, § 111.

Based upon the foregoing rule, the mere fact that there was an intervening act or event is not, as a matter of law, sufficient to constitute a non-conductor and insulate the negligence of the bus company's driver. Such intervening cause must be sufficient in and of itself to break the natural sequence of the first negligence and stand as the efficient cause of the injury and damage. Where a person by his own negligence produces a dangerous condition of things, which does not become active for mischief until another person has operated upon it by the commission of another negligent act, which might not unreasonably be foreseen to occur, the original act of negligence is then regarded as the proximate cause of the injury which finally results.

In Cleveland Ry. Co. v. Crooks, 125 Ohio St. 280, 181 N.E. 102, 103, the defendant was held liable for negligence in discharging a passenger at a place on the street about ten feet from the curb. He was struck by a motor vehicle which undertook to pass to the right of the bus. The passenger was not discharged at a place of safety, for, as the court said:

"The safe and sane point for the stoppage of a motorbus, whether the stop be regular or irregular, is at the curb, where there can be no danger to the passenger who is alighting from vehicular traffic."

The act of the bus company's driver in discharging plaintiff from the bus at the place it did was the proximate cause of the injuries immediately thereafter sustained by plaintiff when he ran into an eastbound truck on the south lane of traffic.

█ Under point three it is contended by the bus company that the plaintiff's action in running across a main road without looking shows him to be contributorily negligent as a matter of law. The question of contributory negligence is ordinarily one of fact for the jury to decide under proper instructions, and it becomes a question of law only when it can properly be said that all reasonable minds would reach the conclusion, under the facts stated, that such facts did not establish due care and caution on the part of the person charged therewith. Russell v. Davis, 38 N.M. 533, 37 P.2d 536; Hogsett v. Hanna, 41 N.M. 22, 63 P.2d 540; Olguin v. Thygesen, 47 N.M. 377, 143 P.2d 585; McMullen v. Ursuline Order of Sisters, 56 N.M. 570, 246 P.2d 1052; Williams v. City of Hobbs, 56 N.M. 733, 249 P.2d 765; Sanchez v. Gomez, 57 N.M. 383, 259 P.2d 346; Zamora v. J. Korber & Co., 59 N.M. 33, 278 P.2d 569.

In the case at bar the plaintiff, a minor, was discharged from the motorbus on the paved portion of the middle of the westbound traffic lane of the boulevard and in his attempt to cross the street to reach his home he ran into a pick-up truck about two or three feet over the center line on the south or eastbound traffic lane.

Whether plaintiff saw the pick-up truck before he ran into it we do not know. The injuries sustained by him have prevented us from knowing what the plaintiff may or may not have observed, as he was unable to remember anything about the accident at the trial which was eight months after the injuries were sustained by him. It is possible, however, that the plaintiff may have looked and seen the pick-up truck approaching. Whether he looked or not we have no means of knowing, but if he did look and saw the pick-up truck approaching, he may have formed a belief, which would be only the belief of an ordinarily prudent ten year old boy, that he had time to pass in front of the truck and to cross the street. While this is a matter of speculation, nevertheless if the plaintiff formed such belief, even though mistaken, and such belief was reasonable, then he was not imprudent in acting upon it.

█ A child of thirteen years of age with the mentality of a ten year old, is not a child of tender years, a term usually applied to children under thirteen years

of age, but neither is he an adult. It is a matter of common knowledge that the stage at which physical and mental maturity is reached varies with the individual and is dependent on many factors. It cannot be determined with mathematical accuracy, but it is universally recognized that it is not reached at the age of thirteen. Until a minor has reached the stage of maturity of showing him to be capable of using the judgment of a reasonably prudent adult, his conduct is not to be measured by the same standard as that of a matured person, but by such judgment and experience as children of similar ages, intelligence, experience and judgment would use under the circumstances. As said in 38 Am.Jur., Negligence, Section 205:

"The fact that a child has passed the age of fourteen does not warrant the belief that it is no longer apt to be daring, thoughtless, and reckless. Moreover the standard by which the conduct of a child is judged, that is, the conduct of a child of· the same age, capacity, experience, discretion, and knowledge, should not be displaced by the standard of adult conduct from the fact alone that the child whose conduct is in question is over fourteen years old."

▇▇▇ It cannot be disputed that all persons are not constituted alike, and the fact that one may recognize a threatened danger more quickly and acts more promptly than another to avoid it does not establish as a matter of law that the latter is negligent.

▇▇▇ We conclude that it was for the jury, in view of all pertinent considerations of age, maturity, intelligence, experience and so forth, to decide whether or not the plaintiff was guilty of contributory negligence as charged, and that the court rightfully submitted this question to the jury under proper instructions on the law. The finding was against the plea of contributory negligence, and the evidence was sufficient to sustain the conclusion of the jury.

Under point four it is argued that the court erred in instructing the jury that the bus company owed the plaintiff the "highest degree" of care. We do not agree with counsel.

▇▇▇ It is fundamental that so long as the relationship of passenger and carrier existed, it was incumbent upon the carrier to exercise the highest degree of care in promoting the safety of its passengers. We take it therefore that it was the duty of the bus company to discharge the plaintiff, as a passenger, at a place of safety. It would not be fulfilling its obligation to discharge him at a place where he would be subject to unusual dangers from vehicular traffic. But it is equally well settled that, after affording a reasonable oppor-

tunity to alight in safety, the carrier is not liable for injuries resulting from intervening causes.

■ As to what constitutes a compliance with the duty to observe the highest degree of care for the safety of its passengers, each case must depend upon its own facts and surrounding circumstances. We think that in the case at bar there is evidence that the driver of the bus company did not exercise such a degree of care towards plaintiff in reference to the place of his discharge from the bus and the circumstances attending it.

We held in the accident case of Cavazos v. Geronimo Bus Lines, supra [56 N.M. 624, 247 P.2d 866], where the passenger was discharged on the gravel shoulder of the highway and in his attempt to cross the same was fatally injured, that, "So long as the relationship of carrier and passenger exists the carrier owes the passenger the *highest degree of care* for his safety and such relationship continues until he is safely discharged from the conveyance of the carrier in a place where he may safely remain", and we reaffirm that holding. Baker & Co. v. Lagaly, 10 Cir., 144 F.2d 344, 154 A.L.R. 1098.

We conclude that the court properly instructed the jury on this phase of the law.

■ Under point five it is seriously urged that the trial court erred in giving instructions Nos. 18 and 27. As to instruction No. 18 it is contended (1) that there was no evidence presented of any imminent peril or of an emergency; and (2) that it failed to limit the doctrine to emergencies not created by the injured person's own conduct.

Instruction No. 18 reads as follows:

"You are instructed that if James Patrick Thompson, a minor, was by a sudden emergency, caused by defendants' negligence, placed in a position of imminent peril to himself without sufficient time in which to determine with certainty the best course to pursue, he is not held to the same accuracy of judgment as is required of him under ordinary circumstances and he is not prevented from recovering for injuries to himself or damage if an accident occurred even though a course of action other than that which he pursued might have been more judicious, provided he exercises ordinary care in the stress of circumstances to avoid an accident.

"The age, experience and intelligence of James Patrick Thompson, a minor, if you find he was confronted by an emergency as well as the circumstances of peril which were presented, are the factors to be considered in determining whether he used such care for his own safety as a child of such age, experience

and intelligence would under the circumstances.

"In this connection, if you find that James Patrick Thompson was placed in a position of imminent peril because of a sudden emergency, you are to judge his conduct in this view."

Instruction No. 27 reads as follows:

"You are instructed that you must find for the plaintiff James Patrick Thompson if you find from a preponderance of the evidence that each of the following facts have been proven: (1) That the driver of the bus stopped the bus and permitted James Patrick Thompson to alight in a place which was not reasonably safe under all of the circumstances. (2) That the driver of the bus knew or reasonably should have known that if James Patrick Thompson alighted at the place he did alight, he would be in imminent danger of being struck by traffic upon the highway. (3) That as a proximate result of alighting from the bus at the place where he did alight, James Patrick Thompson was so struck by traffic upon the highway. (4) That there were no other efficient intervening acts of any person or persons other than the bus driver which proximately caused the accident in which James Patrick Thompson was injured and without which the accident would not

have occurred. (5) If you find that James Patrick Thompson was not guilty of negligence which proximately caused or contributed to the accident."

As to proposition one there was evidence presented that the bus driver stopped the bus at a 45-degree angle approximately six inches from the center line of Lomas Boulevard and permitted the minor to alight at that spot; and that the bus driver observed eastbound traffic following him as closely as twenty feet. Notwithstanding his knowledge of the facts and circumstances which existed he never warned the boy of the danger which confronted him. Surely this young lad did not create the emergency in which he was placed.

In the case of Cole Motor Car Co. v. Ludorff, 61 Ind.App. 119, 111 N.E. 447, 450, the court said:

"If one acts naturally in a case of sudden and instant peril *put upon him by another* and is injured, he may not be guilty of negligence contributing thereto, although afterwards, out of the presence of danger, with time to reflect and consider all the facts, it may appear that another course of conduct might have avoided the injury." (Emphasis ours.)

And in Zoludow v. Keeshin Motor Express, Inc., 109 Ind.App. 575, 34 N.E.2d 980, 982, it was said:

"* * * It is our opinion that, under the circumstances disclosed by the evidence, the appellant was entitled to an instruction as to the duty imposed upon him when suddenly confronted with peril. Our courts have frequently announced the rule that one in a position of peril, *not created by his own negligence,* has a right to make a choice of the means to be used to avoid peril, and he is not held * * *." (Emphasis ours.)

See, also, Mazanec v. Prosser, 323 Ill.App. 652, 56 N.E.2d 489; and Owen Motor Freight Lines v. Russell's Adm'r, 260 Ky. 795, 86 S.W.2d 708, 709.

In the case of Galveston, H. & S. A. Ry. Co. v. Wagner, Tex.Com.App., 298 S.W. 552, 553, the court said:

"Pretermitting consideration of matters of evidence bearing on the issue of contributory negligence, which issue was resolved by the jury against the plaintiff in error, we shall assume for the purposes of the case that Miss Wagner was guilty of contributory negligence, as a matter of law, and shall direct our attention exclusively to the issue of discovered peril.

"In order for a person to be in peril, it is not necessary that bodily injury will certainly be suffered by him. He is in peril whenever he is pursuing a course which probably will terminate in serious bodily injury to him. *Whenever it reasonably appears to a second person, from facts and circumstances within his knowledge,* that a person is pursuing such a course and probably will pursue it to the end, then *in such event, the second person is held to have knowledge of the peril of the other.* This doctrine, we think, is clearly deducible from the many decisions on the subject of discovered peril, * * *." (Emphasis ours.)

As to proposition two it might be said that the instruction standing alone, would be subject to criticism; but in the immediate connection with this instruction the court instructed the jury that "there has been evidence in this case to the effect that Jimmy Thompson got off the bus through the rear door without the operator of the bus having opened the door, and if you are satisfied that the operator Ballinger did not open the door at the time Jimmy Thompson got off the bus, then your verdict should be for the defendant."

Moreover the jury was instructed repeatedly and stressed upon that if it believed that the plaintiff was contributorily negligent and that such negligence was a proximate cause of his injury he could not recover, so that there is no probability that the jury could have been misled because the words "without the negligence on the part of the minor" were not used in said in-

struction. Cf. State v. Compton, 57 N.M. 227, 235, 257 P.2d 915.

The criticism as to instruction No. 27 is: (1) that the only factual situation in which an imminent peril to the plaintiff could have arisen would have been if he had been in danger just as he was alighting from the bus. Then in a sudden panic, he might have dashed the wrong way and been injured; and (2) that the pleadings do not raise the issue of imminent peril doctrine. And that the evidence produced clearly lays absolutely no foundation for a charge to the jury on such doctrine.

■ As to the proposition number one, it was held in the case of Gott v. Kansas City Rys. Co., Mo., 222 S.W. 827, 830, that:

"The carrier is not absolved from liability, nor from this high degree of care, merely because the passenger is not injured while in the *very act of alighting nor at the very spot or moment where and when he alighted* * * *." (Emphasis ours.)

We believe this is a sound rule of law, and therefore we approve the same.

■ As to the second proposition it is urged that the court erred in this respect because sudden emergencies and imminent peril were not pleaded by the plaintiff and that the issues did not arise from the evidence. It needs no statement from this court to establish the law to the effect that it is error in the trial court to charge upon issues which are neither raised by the pleadings nor by the evidence. Did the issues of sudden emergency and imminent peril arise from the evidence in this case so as to warrant the court in charging the jury thereon? We think that these issues clearly arose from the evidence as indicated by the record, a question for the determination of the jury.

We conclude that the court did not commit prejudicial error in charging the jury upon the subjects of sudden emergency and imminent peril.

■ Under point six the bus company complains because the trial judge refused to allow the jury to inspect the bus where it was in a lot very close to the court house. Error is assigned on this ruling. The mechanism of the bus door had already been fully described and explained to the jury. Testimony was offered and received that the bus door could be opened without the use of a lever under the control of the motorman by using extreme bodily pressure against the door. Permission to have the jury view the bus was within the sound discretion of the trial judge and denial of such request was not an abuse of discretion. Western Truck Lines, Limited, et al. v. Berry, 52 Ariz. 38, 78 P.2d 997; Williams v. Kansas City Public Service Co., 147 Kan. 537, 78 P.2d 41; Nelson v.

Belcher Lumber Co. et al., 232 Ala. 116, 166 So. 808.

■ Finally, defendants assert that "the verdict of the jury for $54,000.00 is not supported by the evidence and was the result of passion, prejudice and sympathy: Therefore a new trial or a substantial remittitur should be ordered."

A brief summary of plaintiff's injuries is as follows: Fracture through the base of the skull, with concussion and contusion to the brain stem. Hemorrhage from left ear. Profuse bleeding from left ear and throat. Blood seepage through throat into stomach and lungs. Considerable cloudiness in the lung. Plaintiff was rendered totally unconscious from May 28th until June 2nd, when he began saying a few words that did not connect. On June 9th he was talking fairly well. He did not really clear mentally until June 13th. Was up and around on June 15th which was about eighteen days after the injury. Was discharged from the hospital on June 18th.

Dr. Clinton W. Morgan, a neurosurgeon, called by the plaintiff testified as follows:

"* * * Q. And what does the scar tissue do? Does it pull on the balance of the brain cell, or the brain tissue? A. It contracts down. It may, in certain areas, cause symptoms, that is, if it is up here (indicating), it is going to cause weakness of an arm or leg, and some seizures. If it is in certain areas, one wouldn't know it.

"Q. Well, now what is epilepsy? An irritation of those cells up there? A. One type is, yes.

"Q. What is that? A. One type of epilepsy, the kind that occurs after injury.

"Q. An injury of this type? A. Not necessarily, but any injury that will produce convulsions.

"Q. Well, Doctor, over what period of time is there danger of such a condition, in an injury of this type? A. You mean, of the development of—(interrupted)

"Q. That is correct. A. (continuing) seizures?

"Q. Or any other condition, that is not normal. A. Statistically, most seizures following head injury, are going to develop within a year, about 87 to 70 per cent of them, and we are always leery about a seizure developing over three years after an injury. In other words, I think up to three years.

"Q. If I understand your answer, then, Doctor, they may occur as much as three years after an injury? A. Yes."

Dr. A. B. Stewart, a psychiatrist, called by plaintiff testified that he had examined the plaintiff approximately seven and a half

months after the injury; that he was unable to tell him how he got hurt, or anything about the accident; that he had no memory of that experience.

"* * * Q. Well, what do you mean by that, Doctor? Do you think he will progress mentally or get worse? Just give us your best opinion. A. Well, he may remain exactly as he is. There is a limit to the possibilities of any recovery, other than what he now shows. He also is exposed to the very serious possibility of developing other complications, later.

"Q. Such as what, Doctor? A. Well, epilepsy, a particular one. Also, just an atrophy of that part of the brain, deterioration, and more—more personality changes on the down side, not improving any.

"Q. Well, do you mean, Doctor, that the hemorrhage or the damage to that brain tissue may result in additional scarring of the brain? A. Yes.

"Q. And over what period of time, is your experience? A. Oh, it would take a long period of time, gradually. Months, I would say, or may be two or three years.

*    *    *    *    *    *

"Q. You believe, Doctor, that that is due to the injury which he sustained on May 28th? A. Oh, yes, I think

so. I didn't find any disease in him. I gave him a good physical checkover, and I didn't find anything wrong with the boy, except that is—his face shows the result of his trauma, and one side of his nose, and one eye droops, one lid and one eye droops more than the other. His reflexes on the opposite side, or the left side, deviate a little but, not much, but a little.

"Q. What does that indicate? A. That is a result of the damage he got in through here, to this brain stock, where all the fibers come down and cross over on each side, to control the opposite side.

"Q. Will that condition remain, Doctor, or will that get better? Do you have an opinion on that? A. It will remain.

"Q. That is something that is permanent? A. Yes, sir."

Dr. Martin H. Halvorsen, a psychiatrist, called by the defendants, was of a different opinion than that expressed by Dr. Stewart, except as to epileptic seizures. He testified as follows:

"* * * Q. Now Doctor, seizures and epilepsy sometimes are the result of brain damage, isn't that true? A. Yes, sir.

"Q. Do you have any background or experience, with reference to the time which a person usually takes, to go

into these seizures or become an epileptic, after a blow to the head? A. There have been several studies of that question, and the patient who—the majority of individuals who are going to develop epilepsy, do so, within the first twelve months after the injury."

On cross-examination he testified:

"* * * Q. What do you think was the matter with him? A. I felt that he had suffered a concussion, and a contusion of the brain, and was having what we commonly call a post concussion syndrome.

* * * * * *

"Q. Now, I understood, in response to Mr. Akin's question, that you believe that he should be kept under observation at least one or two years? A. Yes, sir.

"Q. And may epilepsy develop, even for a number of years following serious brain damage? A. Yes, it may.

"Q. So then, Doctor, you wouldn't wish to make any statement with certainty, that this boy may not develop epilepsy? I mean, taking the time and the seriousness of the injury into consideration? A. That is right, I would make no certain statement."

We have carefully examined the entire record and are of opinion that there is substantial evidence to support the verdict of the jury and that it was not the result of passion, prejudice and sympathy.

Considering the nature and extent of plaintiff's injuries and disability, pain and suffering, the possibility of developing epileptic seizures, his age and life expectancy, the present purchasing power of the dollar, we cannot say as a matter of law that it is excessive.

Other errors are assigned and discussed but we consider them without merit.

The cause having been fairly tried, the judgment is affirmed with costs and the cause remanded to the District Court with instructions that it render judgment against the defendants and the surety on their supersedeas bond.

It is so ordered.

COMPTON, C. J., concurs.

SADLER, J., specially concurring.

McGHEE, J., and FEDERICI, D. J., dissenting.

SADLER, Justice (specially concurring).

I concur in the result but not in all that is said in the prevailing opinion by way of observation on the facts in evidence. Much of it impresses me as obiter dictum, not essential to a determination of the basic issues in the case. The jury had ample justification in the evidence for finding primary

negligence on defendant's part and, by the same token, in absolving the plaintiff of contributory negligence. In so resolving this issue, however, there was involved a finer balancing of the facts than on the question of defendant's primary negligence. Prejudicial error in the instructions, when viewed as a whole, is not convincingly established. Nor does the claim of an excessive award in the verdict stand up when the desperate character of the plaintiff's injuries is given full weight.

Accordingly, I concur in the result declared which directs an affirmance of the judgment reviewed.

McGHEE, Justice (dissenting).

I am of the opinion the trial court erred in giving any instruction on imminent danger. The effect of the instruction was to water down and weaken the instructions on contributory negligence and introduce a false issue into the case.

My reason for this view lies in the entire lack of evidence that Jimmy was aware of danger or that he did, or refrained from doing, anything he would not otherwise have done because of the danger. There appear to be but two cases directly on this point and they are: Hanson v. Matas, 1933, 212 Wis. 275, 249 N.W. 505, 93 A.L.R. 546, and Feck's Adm'r v. Bell Line, Inc., 1940, 284 Ky. 288, 144 S.W.2d 483.

In the Hanson case it was held the injured person was not aware of the danger; that as he was not so aware an instruction on acts done in an emergency would not have been proper.

In Feck's Adm'r v. Bell Line, Inc., supra, it is stated at page 485 of 144 S.W.2d that the sudden emergency rule applies "only where the evidence discloses that *one became aware of an emergency* and was put to a rapid choice of alternative courses of action in order to avoid the accident" and the jury might reach the conclusion that the course of action adopted was an unwise one. (Italics by the Court.) In the following paragraph it is stated:

"In the instant case there is nothing in the evidence to indicate that the deceased, Feck, ever realized that he was confronted with a sudden peril or emergency. As far as the evidence goes he may not have seen the truck with which he collided. The evidence wholly fails to show that he became aware of an emergency such as to put him to a rapid choice between two or more courses of action in order to avoid the collision, * * *."

The plaintiff in that case had asked for an instruction on acts done in a sudden emergency, but for the reasons above stated the court held the ordinary contributory negligence instruction together with the ordinary care instruction, was sufficient—that an instruction on sudden emergency was not proper.

So it is in this case. There is absolutely no evidence that Jimmy was aware of any danger or that he even saw the truck which hit him until the instant of the collision. The evidence of all of the witnesses riding in the bus who saw Jimmy leave is that he was demanding the door be opened and when it did open, Jimmy, who was standing on the lower step, jumped off running fast with his head turned back to the bus until he heard the boy on the step above call, "Look out!"; then it was too late. There is no testimony that Jimmy gave any indication of awareness of any danger or that he changed his course of action one iota—he was in a hurry to get off and away.

It will not do to say the instructions on contributory negligence and ordinary care for one's safety cured the error in giving instruction No. 18 on sudden emergency. As above stated the effect of this instruction was to dilute the effectiveness of those given on contributory negligence.

For the reasons stated, I dissent.

I concur only in the result in the disposition of the other claimed errors.

FEDERICI, D. J., concurs.

On Motion for Rehearing

Rehearing denied.

McGHEE, J., and FEDERICI, D. J., concur in amendment of opinion but vote for granting a rehearing, reversing the judgment and granting a new trial.