291 P.2d 1081

AMERICAN INSURANCE COMPANY, a Corporation, and Pennsylvania Fire Insurance Co., a Corporation, Plaintiffs-Appellants,

v.

FOUTZ AND BURSUM, a Co-Partnership and J. L. Foutz and Holm Bursum, individual members thereof, Defendants, Third-Party Plaintiffs and Appellees,

Southern Union Gas Company, a Corporation, Third-Party Defendants.

No. 5902.

Supreme Court of New Mexico.

Dec. 16, 1955.

Dissenting Opinion Jan. 6, 1956.

Quincy D. Adams, James H. Foley, Albuquerque, for appellants.

Johnston Jeffries, Aztec, H. A. Daugherty, Farmington, for appellees.

SADLER, Justice.

The appellants (plaintiffs below) having paid their insured for damages suffered in a gas explosion, as subrogees under the terms of the policies issued, sued the appellees (defendants) through whose negligence the explosion was charged to have occurred for reimbursement to plaintiffs of the amounts so paid them by reason of the damages suffered in said explosion. The cause was tried to a jury and resulted in a verdict in favor of the defendants upon which judgment was duly entered. This appeal is prosecuted by the plaintiffs for the review by us of the judgment so entered against them.

A brief statement of the proceedings below will at this point be made to give a general understanding of the case from the outset to be followed later by an amplified statement of the facts in more immediate connection with the argument being made at the time. The action is one brought by plaintiffs as subrogees of J. Vernon Bloomfield and Jessie Bloomfield to recover the amounts paid by each of two insurance companies to their insured under policies for damages to a house and its contents located in Farmington, New Mexico, caused by an explosion on September 26, 1952. The action is brought against defendants, Foutz & Bursum, a copartnership, and J. L. Foutz and Holm Bursum, individual members thereof, who were engaged as contractors for the City of Farmington in the laying of sewer pipes. It was alleged they negligently struck a service line connected to the Bloomfield house, breaking it and causing gas to escape, which ignited and exploded.

Damages were demanded by Pennsylvania Fire Insurance Company, one of the plaintiffs in the action below, in the sum of $10,000 as the amount paid by it for damage to the house and damages were sought by American Insurance Company, one of the plaintiffs below, in the sum of $2,455.68, as the amount paid by it for damage to the contents of the house. An answer was filed by the defendants denying negligence and later a third party complaint was filed by them against Southern Union Gas Company, seeking reimbursement from it of any amount which might be recovered against them by the plaintiffs.

At the close of plaintiffs'. case the third party defendant, Southern Union Gas Company, moved for a directed verdict and the

defendants interposing no objection to such motion, the court granted the dismissal prayed for. The trial then proceeded as between the plaintiffs and the defendants and resulted in a verdict in favor of the latter upon which judgment was duly entered. A motion for judgment non obstante veredicto, or in the alternative for a new trial, having been filed by the plaintiffs (appellants), after hearing thereon the court denied the same. So much for the proceedings up to the time of judgment and transfer of the cause to this court through an appeal by plaintiffs.

The first point presented as a ground for reversal grows out of the trial court's action in allowing five peremptory challenges to the two original defendants and a like number to the third party defendant, Southern Union Gas Company. The plaintiffs or their counsel for them, insist the original defendants and the third party defendant were only entitled to a total of five peremptory challenges as between them. The defendants took appropriate action below to reserve for review the correctness of the trial court's ruling in this particular. Hence, this action alone by the trial court, presents reversible error if counsel be correct in the contention here made.

The governing statute, 1953 Comp. § 19–1–36, reads as follows:

"In all civil cases each party may challenge peremptorily five (5) jurors and no more, whether the plaintiffs or defendants shall be single or joined."

This statute was before us for construction in Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719, 721. In that case the plaintiff sued jointly the owner and operator of a taxicab in which she was a passenger and the owners of a truck with which the taxicab collided to recover damages for injuries suffered in the collision. The respective owners of the taxicab and truck were represented by separate counsel. When the case was called for trial, counsel for both defendants announced their defenses would be antagonistic and requested the court to allow them five additional peremptory challenges. The court being of opinion that it was a matter within its discretion allowed the two sets of defendants five peremptory challenges each. We held this to be reversible error and said:

"We think the court erred in arbitrarily extending the statute. The term 'each party' means the two opposing sides to a controversy. Each side or party constitutes one party and is limited to five peremptory challenges. By employing the term 'whether * * * single or joined' the opposite parties, though plural, are required to join in the exercise of peremptory challenges. The view expressed here finds accord generally in

the cases. Mullery v. Great Northern Ry. Co., 50 Mont. 408, 148 P. 323; Mourison v. Hansen, 128 Conn. 62, 20 A.2d 84, 136 A.L.R. 413; Ferron v. Intermountain Transp. Co., 115 Mont. 388, 143 P.2d 893. For an interesting discussion of the rule relating to peremptory challenges in criminal cases generally, see State v. Compton, 57 N.M. 227, 257 P.2d 915."

Both sides draw comfort from what we said in the foregoing case, the plaintiffs by reason of the fact that under the situation there existing we confined the separate defendants to a total of five peremptory challenges as between them. The present defendants draw their comfort from the case by pointing out the difference in the situation existing between the parties defendant there and here, arising from the absence of any controversy or conflict between the defendants in the case at bar.

Their counsel point out that while in Morris v. Cartwright the defenses of the two defendants may have been antagonistic to each other, yet neither of them was proceeding against the other in that action as is the case here as between defendants on the one side and third party defendant on the other. It may be well to quote that portion of the third party practice rule which is pertinent to this discussion: Rule 14, N.M.S.A.1953, § 21–1–1 (14)

*When defendant may bring in third party.* "Before the service of his answer, a defendant may move ex parte or, after the service of his answer, on notice to the plaintiff, for leave as a third-party plaintiff to serve a summons and complaint upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him."

We see a distinction between the factual situation in Morris v. Cartwright and that shown here. This distinction we think denies that case the analogy by which counsel for plaintiffs seek to draw it to their support. There, the plaintiff proceeded directly against the two defendants. There was no third party defendant involved in Morris v. Cartwright. It was brought into the case here on a third party complaint filed by Foutz & Bursum, as codefendants, after they had themselves answered the plaintiffs' complaint. The plaintiffs had charged that the negligence of defendants, Foutz & Bursum, was the proximate cause of the damage and injury. In their complaint making Southern Union Gas Company a third party defendant, as third party plaintiffs the defendants alleged that the third party defendant's negligence was the proximate cause of the damage.

The defenses asserted by third party defendant are not against the original plain-

tiffs but against the *third party plaintiffs* (the original defendants). No pleading or claim of any kind is asserted by either plaintiffs or third party defendant against the other. Hence, counsel for defendants (third party plaintiffs) aptly inquire:

> "How, then, can the appellants say that the third party defendant is opposed to the plaintiff or how can he successfully assert that there is a controversy between these parties when as between them there is no 'allegation of fact on one side which is denied by the other side' as the definition of the word controversy is set forth above?"

It is to be noted that in Morris v. Cartwright, supra, we defined the phrase "each party" as used in 1953 Comp. § 19–1–36, to mean "the two opposing sides to a controversy." While in Morris v. Cartwright there may have been antagonistic defenses between the two defendants yet neither was proceeding against the other in that action. Here, however, in the case at bar, the defendants became third party plaintiffs and could in no sense be deemed codefendants with the third party defendant. Indeed, the sole controversy with which the third party defendant was connected, viewing the parties as a whole, was between the defendants (third party plaintiffs) and itself, the third party defendant. The latter was making no claim against nor even interested in any controversy with plaintiff.

We think the case of Ralston v. Toomey, Tex.Civ.App., 246 S.W.2d 308, 309, is so nearly the same as this one on its facts that it should be deemed decisive. Indeed, it does, as we appraise it. In dealing with a like situation, the court said:

> " * * * This court stated the rule in Lofland v. Jackson, 237 S.W. 2d 785, 792:
>
> > " 'The rule is well established that more than one defendant having identical interests and a common defense in a suit constitute but one party. If there is no suggestion of antagonism of interests between defendants found in the pleadings and no adverse issues pleaded by them, they constitute one party and are entitled to only six peremptory challenges to the jury panel in the district court. But the rule is different if the pleadings show that one defendant has asked for judgment over against another defendant. The question then to be determined is whether or not there is a conflict of interest between the defendants. In the case of Gussett v. Nueces County, 235 S.W. 857, 861, the Commission of Appeals lays down the following rule: "It is well settled in Texas that each party to a civil suit in a district court shall be entitled to six peremptory challenges, and parties defendant asking judgment over against each other are within the rule. * * * " ' "

In support of their position and proceeding along the same lines as appellees here have argued, in showing that a separate controversy exists between the third party plaintiffs and third party defendant, apart from that between original plaintiff and original defendant, the opinion continued:

"In this case a controversy existed between the appellees Toomey and Crume. Toomey in his third party complaint against his truck driver, Crume, alleged that the negligent acts of Crume, if any, were 'a breach or violation of a duty owed to' Toomey. He prayed for full indemnity against Crume for any amount which should be adjudged against him, or, in the alternative, he prayed that he be awarded contribution from the third party defendant for any amount which should be granted the appellants as a result of their suit against him. Thus there was an antagonism of interests between the appellees, since Toomey would be liable to the appellants if it were proved that Crume was guilty of negligence. In that event, if it should also be proved that Crume was guilty of a breach of duty toward Toomey, Crume would be liable to Toomey. *Even though Toomey and Crume had a common interest to defeat the main action in which Toomey was being sued by appellants, there was a sepa-rate controversy between Crume and Toomey.*" (Emphasis ours.)

Later, 246 S.W.2d on page 310 the court succinctly stated:

"There existed both in the pleadings and in the circumstances of the collision a jury issue of potentially serious significance between Toomey and Crume."

The only answer the plaintiffs supply to Ralston v. Toomey as an authority is to say that, in Texas, Morris v. Cartwright would have been decided differently from the way we determined it. Such an answer may weaken it as a precedent but it in no manner destroys the rationale of its holding, thus leaving its logic and reasoning unimpaired. We find no error in the allowance to third party defendant of five peremptory challenges in addition to the five such challenges allowed the two codefendants treated as one party to the action. Roberts v. Saunders, 118 N.J.L. 548, 194 A. 1.

This brings us to a consideration of the decisive issue on the appeal, namely, whether the trial court erred in refusing to direct a verdict for the plaintiffs. There was no dispute as to the amounts the respective plaintiffs were entitled to recover against the defendants, if entitled to recover at all. Hence, the issue reduces itself to the simple proposition of whether defendants were guilty of negligence as a

matter of law which proximately caused the damages suffered by plaintiffs' insured. We shall review the evidence sufficiently to determine whether it presented a jury issue, thereby affording substantial evidence for the verdict returned.

At the conclusion of all the evidence, counsel for defendants interposed two motions for directed verdict, the second following a denial of the first. It seems appropriate at this time to state title to the real estate on which the house stood was held in joint tenancy, a circumstance which explains, as will later appear, the occasion for the second or alternative motion. The latter motion was put forward on the theory advanced that, since the real estate was held in joint tenancy, if defendants were found to be guilty of negligence causing the loss and damage, even though the husband of insured should be found to have been contributorily negligent, his negligence could not be imputed to her as a joint tenant and she then would become entitled to recover one-half of the amount sued for to such extent as her joint tenancy established an interest. The trial court heard argument and denied both motions.

Now, for a recitation of the material facts. As already noted, the defendants as contractors for the City were laying sewer pipes on the street on which plaintiffs' insured lived and were excavating with a power machine a ditch in front of their premises in which to lay such pipes. While thus engaged in digging the trench along North Auburn Street in Farmington, New Mexico, on September 26, 1952, in front of the property in question, the machine struck a gas pipe underneath the street, which was connected with a gas main containing natural gas from which such gas was piped directly into the house occupied by plaintiffs' insured.

The striking of the gas pipe by the trench digger bent the gas line at the point of impact but produced no leak at that point. The trench digger struck the gas line about 2:00 o'clock p.m. Mr. and Mrs. Bloomfield, the occupants of the house, were absent from home all afternoon. They returned about 6:30 p.m. Just before the explosion, their son, Gary, went down to the basement and upon returning stated that he smelled gas. Mrs. Bloomfield informed her husband of the information from the son and asked him to check the furnace. He did so and found the pilot light still burning. He started into the bathroom and had scarcely arrived there when the explosion occurred at 7:00 p.m. The working crew had cut off work for the day just prior to the explosion.

To understand the location of the service line struck by the trench digger, one should bear in mind that as originally installed it was connected to the gas meter located

near the northwest rear corner of the house and ran thence toward the street in a straight line alongside the house to a point at the northeast corner of the house directly in front of the premises, then veered off in a southeasterly direction at approximately a 45-degree angle across the front line of the premises to the front property line. It there entered the street where it connected with the gas main at a point approximately 20 feet south of where the service line would have reached the gas main if connected or laid in a direct line from the meter to the gas main, as is customarily done.

That this was a highly unusual place to find the gas service line is demonstrated by the testimony of C. M. Trosper, superintendent of this construction job. Among other things, he testified:

"Q. Had you had occasion to locate service lines in that or other streets in connection with that project prior to that morning?

"A. Prior to that morning, yes.

"Q. How were those service lines located?

"A. A good deal in the same manner."

Another unusual situation existed in that the leak, instead of occurring at the point of impact, was located some 50 or 60 feet from that point following the gas line toward the house where the gas meter was located. Immediately after the explosion,

Mr. Bloomfield ran down into the basement and saw some cotton bedding burning on the floor. The northeast corner of the house was also afire. In an investigation next morning, the service line was dug up and a crack was found in it at the point where the fire was burning the night before. The crack was large enough to permit gas to escape and get into the house through the sandy soil and cause the explosion. No other leaks were found in the service line. There seemed to be no doubt about the fact that the explosion was caused by gas escaping through this leak.

The service line mentioned had been installed by the owner of the property, himself, through a local plumber who testified as a witness in the case and gave it as his opinion that, considering the amount of displacement in the service line, the impact of the trench digger on the service line caused the leak or crack in it at the northeast corner of the house.

The plaintiffs rely most strongly in claiming they were entitled to a directed verdict on certain admissions made at or before the trial by the defendants and also the memorandum of the pre-trial conference. The defendants formally admitted:

1. That one of their employees, acting in the course of his employment operated the trench digging machine engaged in front of the Bloomfield premises on the afternoon of September 26, 1952.

2. That while so operating the machine it struck a gas service line underneath the street which was connected to a gas main for conveying gas into the Bloomfield house.

3. That no notice was given by defendants or their agents to Bloomfield or Southern Union Gas Company, prior to the explosion, that the gas service line had been hit by said machine.

4. That no specific request was made by defendants or their agents to Southern Union Gas Company, prior to the explosion, to locate or assist in locating the gas service line leading into the house in question.

5. That the defendants or their agents knew, prior to the time the machine struck the gas line, that there was a gas pipe line, ordinarily called a service line, leading from the gas main underneath the street to the house in question, although they did not know the exact location of the service line until it was struck.

6. That prior to the time the service line mentioned was struck by the machine, neither the defendants nor their employees or agents had made any specific request on Southern Union Gas Company to locate the gas pipe line which was later struck.

7. That prior to September 26, 1952, and while engaged in work upon the same construction project, the defendants, or their agents and employees, while operating the same or a similar machine as the trench digger used on this occasion, had struck or snagged other gas pipe lines in the City of Farmington, causing leaks.

On the request for admission of facts, the defendants denied that they "made no attempts themselves to find the location of said gas pipe line, other than to ask J. Vernon Bloomfield, the owner of the property." However, there is no proof that the defendants did anything further in this behalf than to make an inquiry of the owner of the property as to where the gas service line was located and to be furnished with the information by him that he supposed it continued in a straight line from the gas meter to the gas main. This was customarily true.

It is on these facts, plus an admission by the defendants that after striking the pipe line and prior to the explosion, they gave no notice thereof, either to Mr. and Mrs. Bloomfield, occupants of the house, or to Southern Union Gas Company, that plaintiffs must rest their claim to have the jury instructed as a matter of law that the defendants were negligent and that such negligence caused the explosion and consequent damage.

■ We have presented the evidence upon which plaintiffs rely to justify their claim of right to an instructed verdict in their favor on the issue of negligence. At the outset of their argument challenging

this claim of plaintiffs to a directed verdict in their favor counsel cite a case much like this one on its facts, being an action against the City of Tulsa, Oklahoma, for the burning of a building as result of an explosion from a gas line which the City allegedly had broken in the construction of a utility ditch. In reversing the judgment of the district court which had sustained a motion to dismiss at close of plaintiffs' evidence, the Supreme Court of Oklahoma in Farmer v. City of Tulsa, Okl., 264 P.2d 299, affirmed the rule so long adhered to in this state, as shown by third paragraph of the syllabus, quoted by counsel, as follows:

"Where minds of reasonable men might differ as to whether evidence adduced by plaintiff is sufficient to show negligence on part of defendant and proximate relationship thereof to injuries complained of, question is one to be resolved by jury."

We have affirmed this rule in almost identical language time and time again. For a few late cases see Olguin v. Thygesen, 47 N.M. 377, 143 P.2d 585; McMullen v. Ursuline Order of Sisters, 56 N.M. 570, 246 P.2d 1052; Williams v. City of Hobbs, 56 N.M. 733, 249 P.2d 765; Thompson v. Dale, 59 N.M. 289, 283 P.2d 623. In most, if not all, of the foregoing cases, we reversed the trial court for erroneously having directed a verdict in favor of the defendant. Here, we are asked to reverse the trial court for not having done that

for which in the foregoing cases we reversed it for doing. This is merely mentioned, incidentally, for obviously it can have no bearing on whether the court in the present case should or should not have given a directed verdict for plaintiffs.

Admittedly, as already indicated, the gas service line was found to be in a highly unusual and irregular place, about 20 feet south of where under normal conditions, one might have been expected to find it. Asked whether he had ever found other such instances, C. M. Trosper, construction superintendent on the job, testified: "I don't recall of any, no sir, not right off hand. I think there were some though."

Another factor, presenting an unusual feature arose on the fact that ordinarily when a service line was snagged by the trench digger, as in this instance, if a leak occurred, it would be at or in the immediate vicinity of the point of impact where the pipe was exposed; whereas in this instance, possibly due to circumstances presently to be mentioned, the leak was some 50 or 60 feet removed from the point of impact. It was the first time in Trosper's experience he had ever found a leak so far removed from point of impact. Touching this phase of the situation, he testified:

"Q. Well, now, was it your practice only to examine that part of the pipe that was exposed to see whether there was a leak there?

"A. Well, ordinarily that would be the part you would expect to be damaged and we, naturally that is exposed and that is what you examine, yes, sir."

When the service line was struck and in accordance with usual practice, the pipe was examined in both directions for leaks. The test was made by applying torches or struck matches to the exposed pipe. Finding no leaks, the digging of the trench was continued. Trosper testified:

"A. * * * In this case, I personally examined the pipe and saw that there was no fracture in the pipe in that immediate part that was exposed, and therefore we went on about our work, thinking that everything was okay."

Another factor in evidence which might be deemed to have some bearing on the question of defendants' negligence, or the want of it, arose on the testimony concerning the manner in which the connections were made in the service line leading from the front property line to the gas meter. By reason of the 45-degree turn at northeast corner of the house, it became necessary to install a joint in the pipe at point of the turn. The type of connection or joint used by Bloomfield's plumber in installing the joint constituted a weak link in the service line, rendering it more susceptible to damage at that particular point, when exposed to strain, than would have been the case if the service line had been laid and constructed in the customary manner. Counsel for defendants argue strongly that no one could be expected to foresee these unusual situations and conditions. The trial court was entitled, they say, to consider the question of whether defendants were negligent in the light of these conditions.

At the time of the accident, the operator of the trench digger was proceeding at only one-third of normal speed, the lowest speed at which it could be operated and kept in motion. This, notwithstanding the fact that if the service line had been located where Bloomfield thought it was and so informed the work crew, and as customarily such lines were laid, i.e., in a straight line from the gas meter to the main gas line, they would have been justified in operating the machine at full speed ahead for some 20 feet north before slowing down for the service line.

Another circumstance having some significance appears. Shortly before ascertaining from Bloomfield the location of the service line, the defendants' construction superintendent asked him for location of the water line and he correctly pointed out exactly where it proved to be and the machine did not strike the water line. Is it any wonder, inquire counsel, that after having verified his information as to location of the water line, the crew

may have felt justified in relying on his statement as to where he believed the gas service line to be? To say the least, say counsel, the jury were entitled to consider this circumstance along with others in passing upon the question whether defendants were negligent.

As a matter of common practice, before commencing digging operations the defendants in endeavoring to locate service lines ordinarily employed two methods: (1) by asking Southern Union Gas Company to help in the location of the service line; or, (2) through inquiries of the property owners. In this instance, they pursued the latter, and a common practice, by inquiry of the property owner. Hence, when Mr. Bloomfield told Trosper he thought the line was directly in front of the gas meter, the latter naturally believed this to be correct because that was the place where such lines were usually found. In this connection, Trosper testified:

"Q. Then why did you assume that the line was where Mr. Bloomfield assumed it was?

"A. Being where the gas meter is or was, it is reasonably certain that that would be where the line would be, and that is what we took into consideration in our operations."

An effort was made through cross-examination of Trosper to show that other methods should have been employed to locate the service line even to the point of putting questions suggesting the ditch could have been dug by hand, using pick and shovel methods. The only time such method was resorted to, it appeared, was when the power driven trench digger neared the established location of a service line, it was resorted to as an extra precaution against damage. The testimony disclosed, however, that the utility company was not always correct in locating such lines and made its share of mistakes in pointing out supposed locations. It was also disclosed that scientific and mechanical devices to locate lines were not always helpful, one of them the "Doodlebug" on occasions "going in every direction." This was due to the presence of so many old, dead lines under the streets, of which there were many in Farmington.

The witness, Trosper, further testified as to the practice of defendants where a pipe was struck. After examining a struck line, if there were leaks, the practice was to notify the utility company at once. If no leaks were found, and, hence, no gas was escaping, something usually ascertained by applying fire to a given area around point of impact, quite naturally the practice was to assume the line had not been injured and trench digging was continued. On occasions, however, after examining a struck line, even though no gas was escaping, they would notify the gas company, since there would occasionally

be a stoppage of gas flowing through, if the pipe had become "kinked up."

Ordinarily, a mere bend in the pipe was not reported. The striking of the pipe here had resulted in bending it at the point of impact. To sum up testimony on the practice in this particular, such reports were made when fractures were detected, stoppages in gas flow were found, or where gas was actually found to be escaping. In the instant case, however, after one of the workmen had exposed the pipe with a hand shovel in the area of the point of impact, there was no evidence of a fracture in the pipe, no gas was found to be escaping and the torch test indicated none, and, obviously there was no stoppage of the flow. Furthermore, there was nothing to indicate a fracture might have occurred some 60 feet removed from the bend in the pipe. Incidentally, one of the workmen of long experience had seen pipe bent as much as two feet without causing a fracture.

Actually, the workmen were not positive, after examining the pipe at this point, but that they had struck a dead line, of which there were many in Farmington. Accordingly, from that point on they cautiously removed only about a foot of the top soil with the machine, while the hand diggers dug around the place where the service line was supposed to be, according to Bloomfield, with hand shovels. Eaves, the oiler on the job, did not believe conditions indicated a break elsewhere in the service line, or that any damage, other than a slight bend in the pipe at the point of impact, had resulted. In fact, neither Eaves, nor Trosper knew the line struck was a utility line. Had they so believed, they would forthwith have notified Southern Union Gas Company, as a standard practice and custom on this job.

While the witness, Trosper, was perhaps the most important one for defendant, being construction superintendent with more than ten years experience in this line of work, his testimony was corroborated in material respects by Eaves, the oiler on the job, and by Little, operator of the power machine. We have considered the material facts in the case as they and other witnesses presented them in evidence. Strangely, there is not too much dispute between the parties when it comes to the material facts. This is evidenced by the number of formal admissions by defendants dictated into the record and set out in the early portion of our opinion.

Unfortunately, we do not have a former decision to serve as precedent for our aid in resolving the decisive issue on the facts. The case of Snider v. Town of Silver City, 56 N.M. 603, 247 P.2d 178, perhaps comes nearer to this one on its facts than any other called to our attention. But aside from being an action in which damages are

sought by reason of a gas explosion, resulting from gas escaping through a leak in a snagged pipe, it furnishes but little aid.

■ Our major problem is to determine whether under the testimony as we have reviewed it, the court would have been warranted in taking the case from the jury and ruling as a matter of law that the defendants were guilty of actionable negligence. We can give but a single answer and that is that it would have been error for the court so to rule. Obviously, under all the evidence and proper inferences flowing therefrom, reasonable minds would differ on whether there was negligence on the part of defendants.

Indeed, in the particular pleaded and as to which most of the evidence was adduced, namely, that in operating the motor powered trench digger, the defendants "negligently caused said machine to strike a gas pipe underneath said street" on which the machine was being operated, there obviously was an issue of fact on the question of defendants' negligence.

As to another ground of negligence, viz., failure to notify Southern Union Gas Company, promptly, of the striking of the pipe, a specification of negligence which defendants did not consider of importance enough to plead, yet which was made an issue in the proof and argued here, the question is narrower on whether there was enough evidence to go to the jury. Nevertheless, even as to negligence in that particular, which becomes less important in view of the jury's finding there was no negligence in the basic particular charged, we think it could not be said as a matter of law that the defendants were negligent.

So much for the claim of plaintiffs that there was not sufficient evidence to go to the jury upon the issue of defendants' negligence. It would have been error for the trial court to instruct the jury the defendants were negligent as a matter of law. But, say their counsel, even if they were negligent, such negligence was rendered innocuous and neutralized by contributory negligence on the part of one of the owners and occupants of the house belonging to J. V. Bloomfield and wife, as joint tenants, which the broken gas line served. That negligence was said to arise on information given defendants' work crew by J. V. Bloomfield as to location of the gas service line. It is claimed misinformation was said to have been given C. M. Trosper, Superintendent for defendants, Foutz and Bursum, the morning of the explosion as to location of the gas service line. It was in evidence that defendants ordinarily employed two methods of ascertaining location of gas service line before excavating along a particular property line, viz., either from the property owner himself or by inquiry of the gas company. In this instance the former method was chosen.

It was near the noon hour when defendants arrived in front of the Bloomfield property with their ditch digging equipment. So near in fact, that Mr. Bloomfield had reached home for his noon luncheon shortly following arrival of the work crew at his property. As soon as he arrived Superintendent Trosper asked him whether he could show him where the water and gas lines came into his property. Mr. Bloomfield replied by stating that he knew where the water line was and he proceeded to show him exactly where it was, as was later found to be the case, according to markings made on the ground at the time it was pointed out by Bloomfield.

Thereupon, the latter was asked where the gas service line was and, leading Trosper to the rear of the house where his gas meter was located, which he pointed out, Bloomfield said, according to Trosper:

"I *assume* it runs right along the north part of the house." (Emphasis ours).

and according to Bloomfield himself:

"A. I stated the meter was at the north side of the house and I guess the line must come out there, out straight from the meter. I didn't say it did I said 'I guess.'

"Q. You are sure you used the word 'guess'?

"A. Yes, sir."

It is on such testimony as this that defendants seek to make out a case of contributory negligence on the part of Bloomfield and to impute same to his wife as a joint tenant in the ownership of the property in question. But it is totally inadequate for the purpose invoked. The very sequence of his answers sufficed to apprise defendants that he was ignorant of the location of the gas line. He answered as to the water line first. He "knew" where it was located. But when immediately thereafter he was asked where the gas service line was he could only "assume," according to Trosper, or "guess," as Bloomfield testified, where it was located. Truly, actionable negligence, primary or contributory, could not rest on a word, whichever was used, so uncertain and indefinite as to be meaningless.

Contributory negligence in another particular, not pleaded but litigated, perhaps, arises on the theory that Bloomfield having installed his own service line through a a local plumber some years earlier was responsible for a weak link therein, by necessitating use of a joint in the line in a departure from a straight line in reaching the gas main. Whether properly raised or not the claim is wholly without merit. The service line was made to convey a gaseous substance only, not to withstand the pressure of a power shovel.

The conclusion that there was no contributory negligence places the trial court in error, of course, in submitting that

issue. The defendants as appellees seek to avoid effect of the error by denying defendants benefit of it through their failure to request special interrogatories, so that it could be ascertained whether the verdict for defendants rests on a finding of no negligence on their part, or contributory negligence on Bloomfield's part. The giving of special interrogatories is discretionary with the trial court, subject to review for abuse. Larsen v. Bliss, 43 N.M. 265, 91 P.2d 811; Crocker v. Johnston, 43 N.M. 469, 95 P.2d 214. If a proper case for them, the defendants were privileged to the same extent as plaintiffs to make a request therefor. We think the trial court erred in submitting the issue of contributory negligence and the failure of plaintiffs to request special interrogatories does not deny them benefit of the error.

Our holding there was not sufficient evidence as a matter of law to warrant submission of the issue of contributory negligence on the part of Bloomfield, the husband, naturally, removes from the case necessity for determining whether his contributory negligence, if found by the jury to exist, would be imputed to his wife. She, along with him, owned the premises involved in joint tenancy, and the issue mentioned was presented and argued with much earnestness pro and con by counsel for the respective parties. Since we conclude there was no evidence of contributory negligence, we find no occasion to express a view on the question.

We might with good reason close our opinion at this point but in view of the possibility of another trial of the case, we may with some justification say something as to a few claims of error presented and possibly avoid the occasion for a second appeal. One such claim of error is that the trial court erred in giving its instruction No. 5, reading:

"You are instructed that in this case the plaintiffs were assignees of Mr. Bloomfield and this suit is not being conducted by Mr. Bloomfield; that he has no interest in the outcome; and that if the plaintiffs should be successful in recovering, that anything they may recover will be theirs and Mr. Bloomfield will have no right to any part of such recovery."

We agree with counsel for plaintiffs that this instruction should not have been given. Counsel for defendants say it was harmless by reason of Instruction No. 6 immediately following which they quote. Among other things, it tells the jury the plaintiffs are subrogated to all the rights of the Bloomfields, their respective insured, and have the same rights to recover as if the Bloomfields themselves were suing, etc. The giving of this instruction only serves to point out the impropriety of giving the earlier one. It

could only emphasize in the jury's mind the fact that the Bloomfields had the money for their loss and, accordingly, were out of the picture. The giving of instruction No. 5 was prejudicial error.

■ Complaint also is made under this point by reason of certain argument said to be inflammatory and prejudicial relative to insurance companies searching their policies after paying a loss for "fine print" provisos to find some means of recovering back money they had paid out for which they had received premiums, etc. The trial court, observing defense counsel was about to rise as if to object, of its own motion, gave the jury an admonitory instruction on the subject by requesting counsel to confine himself to the evidence. Of course, argument such as this was improper and should not have been countenanced. If persisted in, it easily could warrant the declaration of a mistrial. But there was no motion for such action by the trial court and it is not likely this will occur again on a retrial.

■ The plaintiffs complain and rightly of the submission of the issue of unavoidable accident. It could only serve to detract the minds of the jurors from the true and basic issue of negligence or not on the part of defendants. It was error to submit the issue. Compare Frei v. Brownlee, 56 N.M. 677, 248 P.2d 671.

What we have already said renders it unnecessary to consider the two remaining claims of error. It follows from what we have said that the judgment reviewed must be reversed and the cause remanded with a direction to the trial court to set the judgment aside and award the plaintiffs a new trial. The plaintiffs shall have their costs.

It is so ordered.

COMPTON, C. J., and LUJAN and McGHEE, JJ., concur.

KIKER, J., dissenting.

KIKER, Justice (dissenting in part).

It is impossible for me to agree that plaintiffs suffered no serious injury on account of the peremptory challenges allowed. I concur in the opinion except as to peremptory challenges.

The opinion of the majority makes the following clear:

Defendants named Southern Union Gas Co. as third party defendant after having answered plaintiffs' complaint:

Plaintiffs charged that defendants, Foutz and Bursum, a partnership, the individual members of which were joined as defendants, were negligent and proximately caused the injury suffered by plaintiffs:

Defendants in the third party complaint charged that the negligence of Southern Union Gas Co. was the proximate cause of the injury:

No pleading or claim of any kind was asserted by either the plaintiffs or the third party defendants against the other:

The defendants were third party plaintiffs and could not be considered co-defendants with the third party defendants:

The sole controversy with which the third party defendant was connected was between defendants and itself:

The third party defendant "was making no claim against or even interested in any controversy with plaintiffs":

In this situation as to the parties, the trial court allowed five peremptory challenges to the original defendants and the same number to the third party defendant while the plaintiffs were allowed five challenges only. The plaintiffs' attorney objected to allowing five challenges to the third party defendant and after having exercised the five challenges allowed to clients, submitted a challenge to the twenty-seventh juror called to the box for voir dire examination.

This challenge was denied. At that time the original defendants and the third party defendant had each exercised four peremptory challenges.

If there had been no third party defendant, and if the selection of the jurors had proceeded between the plaintiffs and defendants, no more than twenty-four jurors would have been called to the box. This appears from the fact that when the twenty-seventh juror was called and accepted by defendants and third party defendant the jury was immediately sworn and the trial proceeded. When there were eleven jurors in the box thirteen peremptory challenges had been exercised as above shown. This requires that two challenges for cause had been exercised before the twenty-seventh juror was called. With eleven in the box and fifteen challenges all told having been made, the twenty-seventh juror was called. This juror, whom plaintiffs wished to exclude, a fact made known to the court by a request for additional challenges, was sworn with the other eleven and plaintiffs' case tried to him. If there had been no third party defendant, a stranger to any interest or cause of action stated or attempted to be stated by plaintiffs, that juror never would have sat in this trial. Injury to plaintiffs appears to me to be fully established.

Our rule as to the number of peremptory challenges allowed to a party to an action, that is to the plaintiffs or the defendants, is correctly quoted in the majority opinion. Plaintiffs, however many, are allowed five peremptory challenges; and defendants however many, are allowed five peremptory challenges, and *no more*. The rule reads:

"In all civil cases each party may challenge peremptorily five (5) jurors and *no more*, whether the plaintiffs or defendants shall be *single* or *joined*."

1953 Corp. § 19–1–36. (Emphasis supplied.)

The majority opinion, Mr. Justice SADLER writing, finds its justification for the holding as to peremptory challenges announced in this case in decisions from two courts only, Texas and New Jersey. The Texas case cited is Ralston v. Toomey, Tex.Civ.App.1952, 246 S.W.2d 308. Of this case it is said by the majority that it "is so nearly the same as this one on its facts that it should be deemed decisive." In that case R. H. Ralston and Virgil Wilbanks were riding in an automobile which collided with a truck owned by Everett Toomey being driven by Floyd Crume. Toomey was in no way involved in the accident. Ralston and Wilbanks, in cause 1218, sued Toomey, the owner of the truck, for damages resulting from the wreck but did not sue Crume. In another suit, cause 1220, Crume and Toomey sued Ralston and Wilbanks for damages done to the truck and for personal injuries sustained by Crume. After this second suit was filed Toomey filed an amended answer in cause 1218 in which he alleged a cross-action against Ralston and Wilbanks. His amended answer also contained a third party complaint against the driver of his truck, Crume. Crume's answer contained a cross-action against Ralston and Wilbanks, the original plaintiffs.

The issues joined and the facts stated by the various parties in this Texas case were, in my opinion, quite unlike the issues joined here. There all persons were antagonistic to plaintiffs. Trial in this Texas case resulted in judgment in favor of the truck owner, Toomey for eight hundred and fifty dollars and for Crume, the driver, in the sum of thirty-six dollars. From this judgment an appeal was taken by Ralston and Wilbanks.

The first complaint made by appellants, the plaintiffs, to the action of the trial court was in granting to each of the appellees six peremptory challenges. Before further discussion of this case it would be well, I think, to have in mind the Texas rule and something of its history and that which has occurred in the state of Texas as to peremptory challenges.

In 1871 the Texas legislature passed a statute Vernon's Ann.Civ.St. art. 2148, reading:

"Each party to a civil suit will be entitled to six peremptory challenges in a case tried in district court and to three in a county court."

It is to be observed that the words "and no more" do not appear in the act. In 1939 the Texas legislature took such action as had the effect of repealing the statute just quoted. Then the court rules were adopted; Rule No. 233 of the Rules of Civil Procedure is in the identical language of the section of the statute just above quoted.

Texas has had the matter of peremptory challenges under consideration many times. In 1902 the case of Waggoner v. Dodson, 96 Tex. 6, 68 S.W. 813, 69 S.W. 993, was before the Court of Civil Appeals of Texas. In that case Waggoner sued James, Henderson, Kemp and M. and A. F. Dodson, that is, plaintiff sued five defendants. The controversy involved three hundred and twenty acres of land. James filed no answer to plaintiff's complaint and judgment was for Waggoner. The two Dodsons were defendants in possession and in addition to pleading in defense of the action they sought a recovery over from Kemp and from Henderson. Kemp adopted the answer of the Dodsons and in addition asked recovery against Henderson in the event of a victory by Dodson against himself. Henderson in addition to pleading not guilty in answer to the petition of Waggoner and a plea over against James on the warranty, replied to the cross-action of Kemp with a general denial and with a special answer claiming that he was merely serving Kemp in his purchase of property for Kemp from Henderson though he conveyed directly to Kemp. He claimed that he had received no consideration for the conveyance to Kemp. The defendants named by plaintiff made claim that they were entitled to twelve peremptory challenges between them. The plaintiff objected to the request for additional challenges and the court denied the protest and twelve peremptory challenges were allowed. That is Kemp and Dodson together were allowed six peremptory challenges and Henderson was allowed six. From the opinion I quote:

"To this action the first error is assigned, and the assignment, we think, must be sustained. At common law peremptory challenges were not allowed in civil cases at all, and in criminal cases the right was confined to the main issue, and did not extend to the trial of collateral issues. 1 Thomp. Trials, §§ 43, 44, 46; Prof. Jury; §§ 162, 163; 4 Bl.Comm. 353, 396; Freeman v. People, 4 Denio, N.Y., 9, 47 Am.Dec. 216; People v. Hamilton, 39 N.Y. 107; Brooks v. Com., 2 Rob., Va., 845. Unless, therefore, the right is given by statute, it does not exist, from which it results that, if a case arises to which a statute on the subject is not applicable, it must be treated as casus omissus. Our statute gives each party to a civil suit in the district court six peremptory challenges, and no more, and in line with the construction uniformly given similar statutes elsewhere the word 'party' has been construed to include the several plaintiffs or defendants, and does not mean 'person.' Where, however, distinct causes of action against different defendants are tried together, such joinder, by consolidation or otherwise, does not deprive either of them, without

his consent, of the right of peremptory challenge to which he would have been entitled had the causes been separately tried. [Texas & P.] Railway Co. v. Stell, Tex.Civ.App., 61 S.W. 980; [Mutual Life] Insurance Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706. The same ruling has been made where the defendants interpose distinct and antagonistic defenses to the plaintiff's cause of action. Rogers v. Armstrong Co., Tex.Civ.App., 30 S.W. 848. It has even been suggested that, where several defendants cannot agree among themselves as to the division of the challenges to which they may together be entitled, the court should give each an equal number, though we hardly see how this could well be done in the county court, where only three peremptory challenges are allowed. Bruce v. [First Nat.] Bank, [25 Tex.Civ.App. 295] 60 S.W. 1006, and cases cited. But we know of no case in which it has been held that several defendants making a common fight against the plaintiff on the main issue in the case, as in this instance, were entitled to double the number of peremptory challenges allowed the plaintiff. Here the issue between the defendants was secondary and collateral merely, and the plaintiff had no interest in it. Little or no importance was attached to it on the trial. Its solution did not depend upon

conflicting evidence, as did the issues between the plaintiff and the defendants. It would not do to hold that the legislature, in giving to each opposing party to a suit six peremptory challenges, meant to place the plaintiff at such a disadvantage in the selection of the jury to try the main issue. A more reasonable and better view would be that the legislature either overlooked such cases, and thus failed to provide for them, or else deemed them too exceptional to require treatment. The defendants demanded a right to which they were not entitled, and for the unfair advantage thus gained must submit to a reversal of the judgment."

It seems to me that much of the language used in the above quotation is especially pertinent to the situation in the case at bar.

Not only do plaintiffs in our case object to the allowance of five peremptory challenges to the stranger to his suit, called the third party defendant, but after the attention of the court had been particularly drawn to the matter, made demand for additional challenges so that he would not have to try his case to the twenty-seventh juror. After verdict, plaintiffs filed motion in which the same proposition was raised, for a verdict non obstante veredicto, or in the alternative for a new trial.

The case went into the Supreme Court from the Court of Civil Appeals because of a dissenting opinion. The Supreme Court of Texas considered the matter and announced the same rule, as in our Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719, for cases where the contentions of the defendants are not antagonistic one with another and when all have made common cause against the plaintiff; but quoted what had been said by that court in earlier cases as to the possibility of granting a greater number of peremptory challenges in case of antagonism between co-plaintiffs or co-defendants.

The lower Texas court was reversed, the holding being that the additional challenges were properly allowed. It is clearly pointed out in Morris v. Cartwright, supra, that in New Mexico the right to peremptory challenges is not a right to select but to reject jurors and that we must look to the statute of the state for our guide in the matter of peremptory challenges. The words *"no more"* in our statute were emphasized in that opinion as we have emphasized them in quoting the statute above.

The Supreme Court of Texas said, at 69 S.W. 994:

"In the case before us one of the defendants impleaded his codefendant upon his warranty of title, and prayed a judgment against him. His codefendant denied liability on the ground that he had recovered no consideration for the land. Thus we have two cases, —one suit by the plaintiff against all the defendants for the recovery of land, and another by a defendant warrantee against his warrantor a codefendant for a recovery upon the warranty. In the main case all the defendants were alike interested in defeating the action, and it was to their interest to make common cause upon the trial. In the subsidiary case, that of the warrantee against the warrantor, the plaintiff had no interest, but there was an issue of fact made by the pleadings of two of the defendants as against each other, which in the event the plaintiff had recovered would have required a determination by the jury. If this latter action had been an independent one, each party—the warrantee as plaintiff and the warrantor as defendant— would have been entitled to six peremptory challenges, and it is clear that that right was as important to each of them in the subsidiary action as it would have been in an original suit. They were parties to this suit, and, though they had a common interest to defeat the main action, there was a separate controversy as between themselves, and, in our opinion, each should be deemed a separate party in the case, and not as two defendants interested solely in defeating the plaintiff's action,

and constituting but one party, within the meaning of the statute as construed by the decisions above recited. We conclude, therefore, that there was no error in allowing the two defendants each six peremptory challenges."

Except for the antagonism between the defendants, they with the other defendants would have been entitled to exercise only six peremptory challenges under the Texas rule and under our rule as announced in Morris v. Cartwright, supra. But Texas had no statute denying the court the right to increase the number of peremptory challenges to any defendant. In that Texas case in the Supreme Court, that which was done could not have been done, in my opinion, under a statute such as ours. A statute which says that the defendant is limited to five challenges and no more cannot be said properly, by this court to permit the defendant to bring in a stranger to plaintiff's cause with allowance to him of five additional challenges to the disadvantage of the plaintiff; and such disadvantage is shown in this case.

There are many cases in Texas in which the question of the number of peremptory challenges is raised in different factual situations, but the rule has persisted in Texas as established in the case just quoted from.

In the Texas case of Ralston v. Toomey, supra, it is found that all defendants were persons in some way connected with plaintiffs' action. Plaintiffs did not sue Crume, but Crume not only joined in a separate suit against the plaintiffs which was consolidated with the suit brought by plaintiffs for trial but in the cause filed by plaintiffs, filed an answer to the cross-action of Toomey against him together with a cross action against plaintiffs Ralston and Wilbanks. So Crume, before the issues were all made up, became a party to the suit brought by plaintiffs.

It is interesting to note in this case that because Toomey and Crume recovered against the plaintiffs, "the suit between Toomey and Crume proceeded no further than the pleadings." [246 S.W.2d 309.] The plaintiffs, as appellants, insisted in the Court of Civil Appeals that the action by Toomey, the truck owner, against his driver was fictitious and for two purposes: One, to obtain twelve peremptory challenges, and Two, to get the benefit of a front in which Toomey appeared to be asking judgment against Crume.

Since both Toomey and Crume became so thoroughly satisfied with the small verdicts they received that nothing more was done by way of an attempt by Toomey to recover of his servant or agent Crume, there would seem to be some merit in the contention of appellants as to the action by Toomey against Crume.

In any event Crume could not have had six peremptory challenges under our stat-

ute unless he got them, as might be possible, by filing a cross-complaint and thereby becoming a party against the plaintiffs. In the case we are considering nothing of that kind occurred.

It may be further observed with reference to Ralston v. Toomey, supra, that the court took final refuge for its order in the following:

"As a rule a judgment will not be reversed for a trial court's error in allowing or refusing additional peremptory challenges unless the complaining party shows that he has suffered material injury by the court's action. He must show that an objectionable juror sat on the case as a result of the court's action." (Citing cases.)

In many of the Texas cases which permit the allowance of more than six peremptory challenges to the parties to the suit, the rule just mentioned has been relied upon as the ultimate basis for decision. To that rule I would have no objection under a statute (now rule) like that of Texas but it has no application in our case because in it the plaintiff did everything, through his attorney, that could be done to prevent the allowance of additional peremptory challenges and, later, as has been said, by motion, gave the court an opportunity to correct what in my thinking was a grievous error.

The opinion of the majority quotes from Ralston v. Toomey, supra, some statements made in Lofland v. Jackson, Tex.Civ.App. 1951, 237 S.W.2d 785, 792. In the case just cited one Buna Lofland, a single woman, filed suit against R. E. Jackson and Avalanche Gen. Publishing Co., a corporation, to recover damages for personal injuries suffered at a street intersection in Lubbock, Texas, claiming that an automobile struck her. It was being driven by Jackson who was an employee of the Publishing Company. The publishing company filed a cross-action against Jackson seeking recovery from him for any amount which might be obtained against it and in favor of appellant because of any acts of negligence of Jackson. Jackson joined issue with the publishing company by filing a general denial.

The trial court permitted both the publishing company and Jackson, who were named as defendants, to have six peremptory challenges, each, thereby giving to defendants twelve challenges while plaintiff was allowed six only. Our courts cannot allow more than five challenges to defendants who make common cause against the plaintiff under any circumstances without positive violation of the statute of the state which says that opposing parties shall have five challenges each and *no more.* This court properly interpreted that statute in Morris v. Cartwright, supra [57 N.M. 328,

258 P.2d 721], Mr. Justice Compton writing before he became Chief Justice, as follows:

> "We think the court erred in arbitrarily extending the statute. The term 'each party' means the two opposing sides to a controversy. Each side or party constitutes one party and is limited to five peremptory challenges. By employing the term 'whether * * * single or joined' the opposite parties, though plural, are required to join in the exercise of peremptory challenges. The view expressed here finds accord generally in the cases. Mullery v. Great Northern Ry. Co., 50 Mont. 408, 148 P. 323; Mourison v. Hansen, 128 Conn. 62, 20 A.2d 84, 136 A.L.R. 413; Ferron v. Intermountain Transp. Co., 115 Mont. 388, 143 P.2d 893."

I again assert that the Texas rule cannot be followed in this state by this Court without judicial amendment of our state statute. When the statute says that the parties to an action, whether single or joined, shall each have five peremptory challenges and *no more* I take that to mean exactly what it says. No defendant or group of defendants should in any event be allowed to have more challenges than the statute allows without a legislative change in the provision.

In Bergeron v. City of Port Arthur, Tex. Civ.App.1954, 264 S.W.2d 769, the suit was against the city of Port Arthur, a municipality, Bert Davis and W. O. Menshaw, each an employee of the police department, for damages sustained by Bergeron for the death of his wife and for personal injury to himself caused by a collision of a car he was driving and a police car owned by the City and operated by Menshaw, a night captain in the city of Port Arthur. The city of Port Arthur filed a cross action against Davis and Menshaw, its employees, in the event of judgment against it. A cross action was also filed by Davis and Menshaw against the appellant Bergeron. The case was submitted to a jury upon special issues and the jury made answer to fifty-six such propositions. Among other things they found for plaintiff, appellant, and fixed an amount of damages because of the loss of his wife and another amount for his personal injuries and another amount for medical treatment and another amount for damage to his car, but the jury also found that the plaintiff failed to yield the right of way when and where he should and that such failure was the proximate cause of the collision. The jury also found certain other failures on plaintiff's part which contributed proximately to the cause of the injuries sustained.

The court sustained a motion for judgment for defendants on the ground that the jury found plaintiff guilty of various acts of contributory negligence which caused the collision and judgment was entered di-

recting that plaintiff take nothing. Plaintiff appealed. One of the grounds for reversal was that defendants were allowed twelve peremptory challenges when they should have been allowed only six. The court having allowed six peremptory challenges to plaintiff and six challenges each to defendants Davis and Menshaw by reason of the cross-action brought by the city. Now these parties were made defendants by plaintiff and under our statute could not have been allowed the additional challenges.

The Texas rule, which coincides with the New Mexico rule only where a group of defendants make common cause against the plaintiff and have no antagonistic interests one against another, should not be controlling or even persuasive in New Mexico, our statute being so different from the former Texas statute, now one of the state's rules of civil procedure.

The other reliance of the majority as to peremptory challenges is Roberts v. Saunders, 118 N.J.L. 548, 194 A. 1, 4.

In that case the plaintiff Roberts was injured while walking along a street in Atlantic City, New Jersey. He had just crossed an intersecting avenue when an automobile owned and operated by one Rashti ran upon the sidewalk and struck him immediately following a collision between Rashti's car and the automobile owned by Joseph Saunders but then driven by the defendant Harry Saunders.

Roberts sued Rashti, Harry Saunders, and Joseph Saunders. All of these defendants joined issue with plaintiff.

The defendant Rashti filed a counter-claim for property damages against the defendant Harry Saunders and the defendants Harry Saunders and Joseph Saunders each filed counter-claims against the defendant Rashti.

Several grounds for reversal were presented and argued by the defendants against whom judgment was entered. The Court held that there were several reversible errors and reversed the judgment. One of the matters to which the court gave attention was that of peremptory challenges. The trial court ruled that plaintiff was entitled to six challenges and all defendants taken together were entitled to six challenges. The court of errors and appeals of New Jersey quoted the statute of that state, Laws 1911, p. 220, as follows:

" 'Upon the trial of any issue in any civil suit or action in any court in this state, each party shall be entitled to challenge peremptorily six of the general panel of jurors summoned and returned by the sheriff or other officer.' "

Considering the statute the court held that the defendant Rashti was entitled to six peremptory challenges and the defendants Harry and Joseph Saunders were entitled to six peremptory challenges between

them, the interests of the latter two persons not being antagonistic.

It would seem to require no argument whatever to show that the New Jersey court might place an interpretation upon the statute of that state entirely different from any possible construction of our statute. At the trial of any issue made up in New Jersey, each of the contesting parties is entitled to six peremptory challenges under the New Jersey statute. Our statute allows peremptory challenges to plaintiffs and defendants only, and in equal number, regardless of the number of plaintiffs or defendants.

In my opinion the New Jersey case just discussed is of no value whatever in determining how many peremptory challenges should be allowed to the parties in our case.

Our statute was passed long before a third-party defendant was known in New Mexico and if the legislature has failed to make provision for peremptory challenges for third-party defendants or for any others who might in any way come into suits at law, that failure is not to be corrected by the courts.

Section 2, chapter 2 of the Session Laws of 1875-6 provides, as follows:

"In all the courts in this state the common law as recognized in the United States of America, shall be the rule of practice and decision." § 21-3-3, N.M.S.A. 1953.

It has been shown in the Texas cases quoted from that at common law no peremptory challenges in civil cases were permitted. That declaration is found in many Texas cases; it is found in Roberts v. Saunders (N.J.), supra; it is found in our Morris v. Cartwright, supra. It necessarily follows in this state that unless a statute provides for peremptory challenges in civil cases for third party defendants or others who may be contesting any issue collateral to issues joined with plaintiff, there is no such right.

Third party defendants brought into a case such as this, may call for separate trial. Having no interest in plaintiff's cause of action, such a person would probably appeal favorably to a trial court in requesting that the court exercise its power under Rule 42(b), Rules of Civil Procedure, as to the trial of the collateral issue. I quote the rule:

"The court in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues."

I can not concur in allowing additional peremptory challenges, so I express my dissent.